## WHALEY v. GAILLARD, COUNTY TREASURER.

### DeSAUSSURE v. SAME.

1. The legislation of this state in relation to the public debt, beginning with the joint resolution of June 8, 1877, was designed to ascertain judicially, by the rules and principles of law that regulate contracts between individuals, what was the valid debt of the state, and to make ample provision for the punctual payment of interest thereon.

2. The state having by statute constituted a special court for the purpose of determining the validity of any of her obligations declared by the bond commission to be invalid, and having permitted herself to be sued therein, and suits having been then brought against the state by certain persons claiming to be her creditors and representing every class of the securities so reported to be invalid, and an adjudication having been made by the Supreme Court of this state, and no writ of error taken to the Supreme Court of the United States, as was authorized by such statute, the state by subsequent legislation provided a mode by which the percentage of invalidity in its outstanding bonds under this decision of the court should be ascertained, and then directed other bonds to be issued by the state treasurer for so much of the outstanding bonds as were found to be valid, and in exchange therefor, and prohibited county treasurers from receiving any coupons in payment of taxes, except those of such new issue of bonds. *Held*, that this legislation did not impair the obligation of a contract by the state with her bondholders, whereby she had agreed to receive the coupons of her bonds in payment of taxes, but only provided a mode by which it would be definitely and easily ascertained whether a coupon so offered represented any portion of her valid debt, and was therefore receivable in payment of taxes.

3. The state having permitted herself to be sued in a prescribed mode, and having invited all persons asserting certain claims against her to appear and establish them, a person holding such claims but neglecting to appear and litigate them cannot afterwards maintain an action against the state by another proceeding not permitted by the state; nor can he maintain an action against the officers of the state for refusing to do that which the laws of the state forbid.

4. The act entitled "an act to facilitate the collection of taxes," (16 *Stat.*, 785) was not designed to afford the bondholders a means of reopening the question of what is the valid debt of the state (which has been otherwise finally determined), and does not, therefore, apply to cases where coupons of bonds issued by the state are tendered in payment of taxes.

5. Besides, such act afforded a remedy only where the treasurer *illegally* and *wrongfully* refused to receive payment of taxes in the "funds and moneys" tendered; and refusal by such officer to receive coupons declared by the Supreme Court of this state to be invalid is not an illegal or wrongful refusal. And if such decision of the Supreme Court should *now* be reversed, such reversal could not make illegal the acts of an officer previously done under a statute of the legislature passed in accordance with the decision of her court of last resort.

6. A statute which conflicts with any provision of the constitution is a nullity, although there are other provisions with which it does not conflict. Therefore, where this court decided that the "act to authorize a loan for the relief of the treasury" (14 *Stat.*, 182) did not violate the last two clauses of art. IX., ? 7, of the constitution (*Morton, Bliss & Co.* v. *Comptroller General*, 4 *S. C.*, 430); and afterwards decided (*Bond Debt Cases*, 12 *S. C.*, 200) that this act was null and void, because in conflict with two other clauses of this same section of the constitution, bonds issued under this act which were acquired between the filing of these two decisions are affected by the later decision, and are not valid claims against the state.

7. This act for the relief of the treasury attempted to create a public debt which was not for the purpose of defraying any "extraordinary expenditures of the state," nor was it authorized "for some single object," nor was such object "distinctly specified therein." The act, therefore, was in conflict with art. IX., ? 7, of the constitution, and null and void.

8. Whether the expenditure to be defrayed is "ordinary" or "extraordinary" is not left exclusively to the determination of the legislature, but will be adjudicated by the courts when the question is raised.

9. Under an act which authorized the governor to borrow $1,000,000 on coupon bonds of the state, $1,000,000 in bonds were issued, and subsequently there was a second issue of like amount. *Held*, that the bonds of this second issue were invalid; for the act did not authorize the substitution of new bonds for the debt incurred by the issue of the first bonds, nor did it authorize a new and additional debt to be created by a second or other issue.

10. The consolidation act (15 *Stat.*, 518) was not passed as is required by the constitution where a public debt is to be created, and, therefore, did not make anything a public debt that was not at that time a valid obligation of the state.

11. An act of the legislature cannot create a public debt of the state unless the constitutional requirements are complied with, notwithstanding the fact that the effect of such act as a whole reduces the volume of the public debt.

12. The legislature cannot contract a debt except as authorized by the

36

constitution, and the consolidation act not having been so passed as to create a debt, any contract, whether by compromise or otherwise, attempted by that act was without authority and not binding upon the state.

13. This consolidation act was a proposition addressed to bondholders individually, and not to them as a class, nor did it require from any person a surrender of all his bonds in order to be entitled to an exchange of any of them. It cannot, therefore, be called a composition by the state with her creditors. This case distinguished from *Lost Bonds Case*, 15 *S. C.*, 224.

14. *Bond Debt Cases* (9, 11, 21, 29), 12 *S. C.*, 200, affirmed.


Before KERSHAW, J., Charleston, February, 1883.


These were two actions, under the act of December 24, 1878 (16 *Stat.*, 785), to recover money paid for taxes, one being by B. J. Whaley against P. C. Gaillard, treasurer of Charleston county, and the other by L. D. DeSaussure against the same defendant. They were tried together.

The plaintiffs requested the presiding judge to charge as follows:

1. That the provisions of the act of December 22, 1873, were in the nature of proposals to the creditors of the state, and when the consolidation bonds were issued under said act and taken by the creditors, a contract was consummated between them and the state as fully as if all the provisions of the act had been embodied as express stipulations in the most formal instrument signed by the parties.

2. That the pledge that the coupons of the bonds so is u d should be received in payment of all taxes due the state during the year in which they matured, except for the taxes levied for the public schools, formed a part of the contract, and was the security offered to the creditors. That the act of the legislature of South Carolina, entitled "an act to raise supplies and make appropriations for the fiscal year commencing November 1, 1881," in so far as it prohibited the county treasurer from receiving the coupons of the consolidated bonds referred to in the complaint in payment of the taxes levied by said act, is null and void, as repugnant to article I., section 10, of the constitution of the United States.

3. That the validity of the bonds for the relief of the treasury, issued under the act of 1869, which were surrendered to the state by the Yonkers Savings Bank in May, 1875, must be determined according to the law as it was judicially construed to be in the case of *Morton, Bliss & Co.* v. *The Comptroller General*, and were valid obligations of the state. That the decision subsequently made by the Supreme Court of the state in the State Bond Cases cannot receive a retroactive effect without impairing the obligation of contracts long before entered into.

4. That by the act of August 26, 1868, the governor of the state was authorized to borrow on the credit of the state, on coupon bonds, within twelve months from the passage of the act, a sum not exceeding $1,000,000, or as much thereof as he might deem necessary to pay interest on the public debt. That the governor was invested with full discretion, and was clothed with full authority, in determining the necessity for the issue of the bonds, the mode of their issue, and the amount of bonds to be issued in order to raise the sum of money required; and *bona fide* holders for value of the bonds issued by him, or of the coupons of such bonds, had no means of knowing in what manner the governor exercised this discretion, and they cannot be affected by any abuse of authority by him. That by the recital on the face of the bonds that they were issued under the act approved August 26, 1868, the state, as against a *bona fide* holder for value, was estopped from disputing the truth of such representation.

5. That the legislature having, with a full knowledge of all the facts connected with the alleged over-issue of the bonds for the payment of interest on the public debt, authorized the funding of the said bonds, has waived said objections and validated the bonds.

6. That the settlements made between the state and the Yonkers Savings Bank of New York, in May, 1875, and between the state and Levy & Borg, on October 13, 1875, were such compromises of doubtful rights as are sufficient foundation for an agreement and consideration for a contract; and the validity of the new bonds issued to the Yonkers Savings Bank and to Levy & Borg rests upon these contracts and compromises, and not upon the validity of the surrendered and cancelled securities.

7. That the settlement made in May, 1875, between the State of South Carolina and the Yonkers Savings Bank was a unity, and the state cannot set it aside in part while it retains the Land Commission bonds surrendered by the Yonkers Savings Bank at the time said settlement was made, and the same rule applies to the settlement between the state and Levy & Borg, of October, 1875.

These requests were all refused, and the judge then charged the jury as follows:

"GENTLEMEN OF THE JURY: Under the present condition of the law affecting this case, as determined by the Supreme Court, and the legislation connected therewith, you are directed, on the pleadings and the evidence submitted, to find a verdict for the defendant."

Verdict for defendant and judgment entered accordingly.

The plaintiffs appealed upon exceptions alleging error in the judge's charge and in his refusal to charge as requested.

*Messrs. Lord & Inglesby, Buist & Buist, Simonton & Barker, Simons & Seigling, and T. M. Mordecai, for appellants.*

As an appeal lies in these cases to the Supreme Court of the United States, it is important to examine the questions presented in the light of the decisions of that court—12 *S. C.*, 271. The coupons tendered are void under the decision in the *Bond Debt Cases*, but we ask a reconsideration of that decision. As to the bonds for the relief of the treasury, we contend that the decision in 4 *S. C.*, 430, applied to all bonds of the class there considered; and at the session of the legislature next succeeding, the act was passed under which these consols were issued; the bonds were thus acquired under the law as then declared, and cannot be affected by subsequent statutes or decisions. 12 *S. C.*, 282. The objections now urged are different from those then urged, but were as apparent then as now. 101 *U. S.*, 677. As to the second issue of bonds to pay interest, we submit that the act did not limit the governor to a single issue, but that he had authority to borrow $1,000,000 within twelve months. He had full discretion and authority to determine the necessity, the mode, and

the amount of issue. 12 *S. C.*, 275; 103 *U. S.*, 696. If he has been guilty of irregularity, or even of fraud, the state must be the loser, and not an innocent holder. *Dixon County* v. *Field*, 111 *U. S.*, 83. With full knowledge of all the facts, the legislature has waived all objections and validated the bonds by directing them to be funded. 4 *S. C.*, 430. The consolidation act was a compromise and composition made by the state with her creditors. 105 *U. S.*, 278; *Story Cont.*, § 449; *Story Eq. Jur.*, 129–131; 6 *Cl. & Fin.*, 911; 4 *Ves.*, 840; 5 *Peters*, 99; 4 *Metc.*, 270; 2 *Strob. Eq.*, 258; 15 *S. C.*, 232. The consolidation act did not require a two-thirds vote, to be recorded by yeas and nays, because it did not create a further debt, nor was it for an extraordinary expenditure, nor the appropriation of money needing a new tax levy. It provided for a reduction of the ascertained debt of the state, and for its reduction, liquidation, and redemption. It reduced the public debt by several millions of dollars.

*Mr. Clarence A. Seward*, same side.

*The Attorney General*, contra, argued that the decision in the *Bond Debt Cases* was correct. He further contended that the contract of the state was only to receive coupons of valid consolidation bonds in payment of taxes. There are coupons outstanding of invalid bonds having the similitude of valid bonds. Whether valid or invalid, the county treasurer cannot determine, and therefore he is required to receive coupons of the recognized valid or brown bonds. The state can protect herself, by reasonable requirements, from receiving invalid coupons; and she does not thereby impair the obligation of her contract. These requirements constitute a part of the remedy provided by the state, and the only limitation upon the state is that there must be an adequate and efficacious remedy. The remedy provided is analogous to that given by the act of 1877 (16 *Stat.*, 302), approved in 101 *U. S.*, 437. See too 107 *U. S.*, 769. In those cases, the proceedings to determine the validity of the bills or coupons tendered were to be taken after tender, while here they are to be taken before tender; but the principle is the same. The validity

of the seventh section of act of 1882 must be determined by the law as declared when these coupons were tendered. Under the act to facilitate the collection of taxes, only such amount can be recovered as was wrongfully and illegally collected. The county treasurer is bound to obey the law as declared by the courts; the law forbade him to receive these coupons. 107 *U. S.*, 712. The plaintiffs here have another and full remedy—they can demand brown consols from the state treasurer in exchange for their green bonds; and if that officer refuses, they can apply for a writ of *mandamus,* and thus have the question of their validity determined. 107 *U. S.*, 781.

*Mr. L. F. Youmans,* same side.

November 14, 1884. The opinion of the court was delivered by

MR. JUSTICE McIVER. These two cases, involving as they do similar general principles, were heard and will be considered together. The plaintiffs tendered to the county treasurer in payment of their taxes certain coupons of bonds, alleged to have been issued under the provisions of an act entitled "an act to reduce the volume of the public debt and provide for the payment of the same," approved December 22, 1873 (15 *Stat.,* 518), which were refused by him upon the ground that said coupons had been adjudged by the decision of this court, in the *Bond Debt Cases* (12 *S. C.,* 200), not to be valid obligations of the state, and their receipt in payment of taxes had been forbidden by law. Thereupon these actions were instituted to recover the amounts mentioned in said coupons, the plaintiffs claiming a right so to do, under the provisions of an act entitled "an act to facilitate the collection of taxes," approved December 24, 1878 (16 *Stat.,* 785), and incorporated in the general statutes of 1882, as sections 268, 269, and 270, the avowed object being to obtain from this court a reconsideration of its former decision in the *Bond Debt Cases, supra,* with the view of carrying the question involved to the Supreme Court of the United States; but whether this object can be attained by these proceedings will be hereinafter considered.

The legislation of this state, a brief abstract of which is given in the pleadings, beginning with the joint resolution adopted June 8, 1877, was manifestly designed to ascertain *judicially* by the rules and principles of law which regulate contracts between individuals, what was the valid debt of the state, and to make ample provision for the prompt and punctual payment of the interest on the debt so ascertained. In pursuance of this manifest design the legislature first directed a committee of its members, usually called the "Bond Commission," to make a thorough investigation of the debt of the state, and report all the facts, together with their conclusions, to that body. When that report was made, the legislature, without undertaking to decide for itself the various questions raised in said report, as to the validity of a large portion of the alleged debt of the state, and notwithstanding the fact that the state could not be sued without its consent, voluntarily threw down the barriers which exempted it from suit, established a special court, consisting of three of the Circuit judges of the state, called the "Court of Claims," invested it with jurisdiction "to hear and determine any case or cases brought to test the validity" of any of the bonds or other obligations of the state reported by the "Bond Commission" as invalid, and provided for a right of appeal to the Supreme Court of the state, together "with a right of appeal by writ of error or otherwise, as provided by law, to the Supreme Court of the United States." Joint resolution, approved March 22, 1878, 16 *Stat.*, 669.

Several of those holding bonds or coupons, reported as invalid by the "Bond Commission," embracing all of the various classes so reported, brought suits thereon against the state in the Court of Claims, and from the judgment of that court in favor of the state, appeals were taken to the Supreme Court of the state, which court, on September 29, 1879, rendered its decision, adjudging all of the various classes of bonds there brought in question to be valid obligations of the state, except those issued under an act entitled "an act to authorize a loan for the relief of the treasury," approved February 17, 1869 (14 *Stat.*, 182), and the second issue of bonds under an act entitled "an act to authorize a state loan to pay interest on the public debt," approved August 26, 1868 (14 *Stat.*, 18), which, together with the consolidation

bonds, issued in exchange therefor, under the act of December 22, 1873, cited above, and usually designated as the "consolidation act," were declared invalid. The coupons in question in these cases belong to the classes so declared to be invalid. From this decision no appeal was taken, either by writ of error or otherwise, and so far as we are informed, from the time when it was rendered, September 29, 1879, to the time of the commencement of these actions, December 5, 1882, and January 3, 1883, no person claiming to be a creditor of the state has instituted any proceedings to ascertain or enforce any liability on the part of the state on either of the two classes of bonds thus adjudged to be invalid, or any consolidation bond issued in exchange therefor.

After the judgment of the Supreme Court of the state, above mentioned, was rendered, there being no intimation of any appeal therefrom, the legislature of the state passed an act entitled "an act to provide for the settlement of the consolidated debt of the state, in accordance with the decision of the Supreme Court of South Carolina," approved December 23, 1879 (17 *Stat.*, 104), which, with an amendment thereto, approved February 19, 1880 (17 *Stat.*, 240), provided, amongst other things, for the appointment of a special commissioner, whose duty it should be to eliminate from the original consolidation bonds, presented for that purpose, so much thereof as had been adjudged to be invalid, reporting his action in the premises from time to time to the state treasurer, and for a new issue of consolidation bonds of a different color from the original, representing so much of the debt as had been adjudged to be valid.

In pursuance of these provisions a very large amount of the original consolidation bonds, which were colored green, and are usually designated as "green bonds" or "green consols," were exchanged for the new consolidation bonds, colored brown, and are usually designated as "brown bonds" or "brown consols," and represent the valid unquestioned debt of the state, the coupons on which are received for taxes, or are promptly paid on presentation. But as it was impossible to tell whether a "green bond" represented in whole or in part, and if so what part, any portion of the valid debt of the state, without an examination of the records of the office of the treasurer of the state, where the

various reports of the special commissioner above mentioned were filed, the various county treasurers of the state are not allowed to receive the coupons of the "green bonds" in payment of taxes until they have been examined, and any invalidity which they may contain eliminated and the valid portion converted into "brown bonds."

It seems, therefore, that the scope and effect of this legislation was not to impair the obligation of any contract entered into by the state with its bondholders, whereby the state had agreed to receive the coupons of certain bonds in payment of taxes, but was simply to provide a mode of proceeding by which it could be definitely and easily ascertained whether a coupon offered in payment of taxes represented any portion of the valid debt of the state; for, unless it did, there certainly was no contract on the part of the state that it should be received in payment of taxes. It was in close analogy to the proceeding prescribed for ascertaining whether bills of a bank owned and controlled by the state, and which had been declared receivable in payment of taxes, were valid obligations of the state, and as such entitled to be received for taxes. *Tennessee* v. *Sneed,* 96 *U. S.,* 69.

As is said by Waite, C. J., in *South Carolina* v. *Gaillard,* 101 *U. S.,* at page 437, in speaking of similar legislation: "It does no more than provide a way of determining whether bills offered in payment of taxes are binding on the state." It certainly cannot be pretended that because a taxpayer tenders in payment of his taxes a coupon of a bond purporting to be a consolidation bond of the state, colored green, that the state and its fiscal officers are bound to receive it without question as to whether it is valid or invalid; and as the state cannot be sued except with its own consent, and then only in the mode which it permits, it follows necessarily that the only mode by which the validity of the coupon so offered in payment of taxes can be tested is that which has been prescribed by the state.

It is contended, however, that the plaintiffs in these actions were not parties to any of the actions instituted in the Court of Claims, and are, therefore, not bound by any adjudication therein. This position might possibly be very well maintained if the defence here was based simply on the doctrine of *res adjudicata;* but that

is not the ground upon which the defence rests. The true ground is, that as the state could not be sued except with its own consent, and then only in the mode which it had seen fit to prescribe, and as the state did prescribe a mode by which it could be sued, and the validity of its debt tested upon the same principle by which the contracts of individuals, are tested, and having invited *all* persons having claims against it, whose claims were disputed, to come in and assert and establish their claims, one who has failed to avail himself of the opportunity thus offered, cannot afterward, in another proceeding, not permitted by the state, maintain an action against the state, or against any of its officers, for refusing to do that which the laws of the state forbid. *Louisiana* v. *Jumel*, 107 *U. S.*, 711; *Antoni* v. *Greenhow*, *Ibid*, 769.

But appellants contend that the the act of 24th December, 1878, entitled "an act to facilitate the collection of taxes" (16 *Stat.*, 785), expressly authorizes the plaintiffs to bring these actions against the county treasurer when their coupons have been tendered for taxes and refused. This position is, we think, based upon a total misconception of the true meaning of that act. It certainly never was designed to afford an opportunity to a bondholder to reopen the question as to the validity of any portion of the state debt, which it was supposed had been determined by the decision of this court in the *Bond Debt Cases*, from which no intimation of appeal had been given. The very object of the legislation of the state hereinbefore considered, was, as we have seen, to obtain a *final* determination of the question of the validity of the state debt; and certainly the legislature, by an act passed nearly a year before such final determination was reached, never intended to afford the means of reopening any of the questions thus finally determined. In addition to this, the phraseology of the act shows that it was never designed to afford a remedy to the bondholder in case his coupons were refused when tendered for taxes, but was intended solely to afford a remedy in case bills of the bank of the state were refused when tendered for taxes.

But even if it should be conceded that the terms of the act to facilitate the collection of taxes were broad enough to cover a case in which coupons of bonds purporting to be bonds of the state

are refused when tendered for taxes, as well as a case in which taxes are tendered and refused in other "funds and moneys" than the collecting officers are authorized, by the act levying such taxes, to receive, we do not see how these actions can be maintained. By the express terms of the act it must be made to appear that the county treasurer has *illegally* and *wrongfully* refused to receive payment of the taxes assessed against the plaintiff, in anything else but "gold and silver coin, United States currency, national bank notes, and coupons which shall become payable during the year 1882, on the valid consolidation bonds of this state known as 'brown bonds,'" as required to do by the 7th section of the "act to raise supplies and make appropriations for the fiscal year commencing November 1, 1881," approved February 9, 1882, 17 *Stat.*, 1070. Practically this last mentioned act forbids county treasurers from receiving in payment of taxes any coupons of bonds which have not been ascertained in the manner prescribed by the legislation hereinbefore mentioned to be valid obligations of the state.

Now if, as we have seen, the state had the right to prescribe the mode by which the validity of any bond purporting to be an obligation of the state should be tested and determined, and if, as we have also seen, such mode was prescribed, and the validity of all the various classes of bonds purporting to be obligations of the state was passed upon and finally determined, it would seem to follow necessarily that the state had a perfect right to forbid its officers, charged with the collection of its revenue, from receiving in payment of taxes any coupons or other form of obligation which had not only *not* been adjudged to be a valid obligation of the state, but which, on the contrary, had been expressly adjudged to be invalid. There certainly can be nothing *illegal* or *wrongful* in an officer of the state yielding obedience to a law of the state passed in the usual form, in pursuance of a judgment of its highest judicial tribunal, from which there had been no appeal to the tribunal of last resort, although express provision had been made for such appeal.

Even, therefore, if it be conceded that the language of the act to facilitate the collection of taxes could, by a liberal construction, be regarded as broad enough to cover a case in which cou-

pons had been refused when tendered for taxes prior to the adjudication of the validity of the state debt, or in a case which might subsequently arise in which coupons of the "brown bonds" should be refused when tendered for taxes, if the legislature should hereafter see fit to prohibit the reception of such coupons for taxes, yet it is very clear that it cannot apply to the present case, in which the coupons refused have already been adjudged invalid. The decision in the *Bond Debt Cases*, whether right or wrong, settles the law of the state until it is reversed or overruled by competent authority, and until that is done any act passed by the legislature in pursuance of the principles there determined must be regarded as the law of the land to which every officer is bound to yield obedience, and his act in doing so cannot be characterized as either illegal or wrongful.

We do not see, therefore, how the correctness of the principles determined in the *Bond Debt Cases* can be brought under review in these cases, so as to determine their decision. For even if it should *now* be determined that there was error in that decision in holding that the second issue of bonds to pay interest on the public debt, and the bonds issued for the relief of the treasury, together with the bonds issued in exchange therefor under the provisions of the "consolidation act" of 1873, were not valid obligations of the state, and that the coupons tendered by the plaintiffs in payment of their taxes are valid obligations of the state, we do not see how this could affect the result in the present actions. At the time the coupons were tendered and refused, the law, as it was *then* settled, justified such refusal, and any subsequent change in the law, either by statute or judicial decision, cannot affect a transaction occurring before such change in the law. *Ohio Life Insurance and Trust Company* v. *Debolt*, 16 *How.*, 432; *Gelpcke* v. *Dubuque*, 1 *Wall.*, 206; *Lee County* v. *Rogers*, 7 *Id.*, 181.

But was there any error in the decision in the *Bond Debt Cases?* According to the proper practice appellants applied for and obtained leave to be heard against some of the points determined in that case, and the questions involved have been ably and elaborately argued on both sides. We must say, however, that the additional light thus thrown upon these questions only

serves to convince us more fully of the correctness of the former decision. We do not propose to go over the ground covered by the former opinions, which will be found at page 263 and page 294 of 12 *South Carolina Reports*, but shall confine our attention to those points which it is supposed, erroneously however, were not fully considered before ; for although some of the points now relied upon may not have been discussed in either of the former opinions, yet the most, if not all of them, were carefully considered in reaching our conclusion.

First, it is contended that the act to authorize a loan for the relief of the treasury had been adjudged to be constitutional by the decision of the Supreme Court of this state in the case of *Morton, Bliss & Co.* v. *Comptroller General*, 4 *S. C.*, 430, and that the subsequent decision in the *Bond Debt Cases*, holding this act to be unconstitutional, cannot affect the rights of those who acquired their bonds issued under that act and funded them in consolidation bonds under the act of 1873, as they "must be regarded as having acquired the bonds so surrendered upon the faith of the law as it was then declared to be, and their rights cannot be affected by any subsequent change in the law, whether such change be effected by statute or by judicial decision."

The decision in *Morton, Bliss & Co.* v. *Comptroller General* was rendered August 27, 1873, and the facts as gathered from the records in these cases are : That Whaley acquired the coupon upon which his action is based about November 9, 1882, from Eames & Moore, who had funded bonds under the consolidation act on October 14, 1874, but when they acquired the bonds which they then funded, whether before or after the decision in *Morton, Bliss & Co.* v. *Comptroller General*, does not appear. The other plaintiff, DeSaussure, acquired the coupons upon which his action is based on March 11, 1878, from Levy & Borg, and from the Yonkers Savings Bank, who had funded bonds under the consolidation act, the one in May and the other in October, 1875 ; but it does not appear whether they, or either of them, acquired the bonds so funded before or after the decision of the case of *Morton, Bliss & Co.* v. *Comptroller General*.

It seems, therefore, that Whaley acquired his coupon *after* the change in the law (as it is, called) by the decision in the *Bond*

*Debt Cases*, and DeSaussure acquired his *after* the investigation into the validity of the state debt had been announced, and *after* the report of the bond commission had been made (February 7, 1878), by which the bonds from which his coupons were taken had been reported as invalid, and were soon after so adjudged to be. So that the doctrine relied upon cannot apply to these cases.

But in addition to this the position of the plaintiffs cannot be maintained, because, conceding the correctness of the abstract proposition of law upon which it rests, it is based upon an entire misconception of the scope and effect of the decision in the case of *Morton, Bliss & Co.* v. *Comptroller General.* That case did not decide that the "act to authorize a loan for the relief of the treasury," was constitutional, but it simply decided that the objections to the constitutionality of that act, *which were interposed in that case*, were not tenable. The only objections *there urged* were, 1st, that the act was in violation of that clause of the constitution which required that no law providing for the contracting of a public debt should take effect "until it shall have been passed by the vote of two-thirds of the members of each branch of the general assembly," and 2d, the clause which declared that "every such law shall levy a tax annually sufficient to pay the annual interest of such debt," and the construction there given to these two clauses was recognized and followed in the *Bond Debt Cases.*

But when the question was presented, in the last mentioned case, whether the act in question was in conflict with two other distinct and separate clauses of the constitution, neither of which was construed, or considered, or even mentioned in the former case, it was clearly the duty of this court to construe those two clauses, and determine whether the act in question was in conflict with both or either of them. It is perfectly manifest from the language used by the court in *Morton, Bliss & Co.* v. *Comptroller General*, that they did not undertake to decide anything whatever, except whether the objections there urged to the constitutionality of that act were well founded. At page 462 of 4 *S. C. Reports*, the language is: "The objection of the respondent to the constitutionality of the acts in question, *on the*

*ground that no such provision was made by tax for the payment of annual interest*, is not well taken." Again, at page 467 : "It must, therefore, be concluded that a vote of two-thirds of the members present at the time the vote was taken, satisfies the requirements of the constitution. The respondent's objections, *in this respect*, are not well taken." And again, on the same page : "We have now considered *all the objections urged by the respondent* involving the question of the constitutionality of the five acts of the legislature, set forth in the relator's petition, and find that they present no just ground of objection to the validity of either of such acts."

This language of the court, thus carefully confining their decision to the points made in that case, was well calculated to put the bondholders, as well as the general public, upon their guard, by showing that the court did *not* intend to pass upon the general question of the constitutionality of the several acts there considered, but simply to determine whether the objections *there urged* were well founded. Finally, the language of Willard, C. J., who had prepared the opinion of the court in *Morton, Bliss & Co.* v. *Comptroller General*, in the concluding paragraph of his separate opinion in the *Bond Debt Cases*, shows conclusively that he did not understand that the general question of the constitutionality of the act to authorize a loan for the relief of the treasury was considered or determined in the case of *Morton, Bliss & Co.* v. *Comptroller General.*

The cases of *County of Cass* v. *Johnston*, 95 *U. S.*, 360, and *Douglass* v. *County of Pike*, 101 *Id.*, 677, are relied upon by appellants to sustain their position upon the point which we have just been considering, but we think an examination of those cases, in connection with the previous case of *Harshman* v. *Bates County*, 92 *U. S.*, 569, will show that they do not sustain their position. In those cases it was *the same clause* of the constitution of Missouri, which at different times had received different construction, and while it may well be that, when the construction of a particular clause of the constitution of a state has been settled by the highest judicial tribunal, rights accruing under such a construction cannot be impaired or affected by a subsequent change of such construction, it does not by any means

follow that rights claimed under a statute which is in conflict, with any provision of the constitution, can be enforced by the courts, simply because it has been adjudged that such statute did not conflict with some other distinct clause of the constitution.

A statute which conflicts with *any* provision of the constitution is a dead letter, an absolute nullity, and the fact that the courts have decided in one case that it does not conflict with a particular clause in the constitution cannot impart any vitality to it, if it is found to be in conflict with some other clause of the constitution. Full effect was given to this view of the doctrine contended for in the decision of the *Bond Debt Cases*, and it was there held that the construction placed by the court in *Morton, Bliss & Co.* v. *Comptroller General*, upon those clauses of the constitution *which were then brought in question*, was conclusive and binding, although grave doubts were then entertained by a portion of the court, at least, as to the correctness of such construction.

In *Boyd* v. *Alabama*, 94 *U. S.*, 645, which is recognized in *Douglass* v. *County of Pike*, 101 *Id.*, at page 687, as well expressing "the rules which properly govern courts in respect to their past adjudications," it is said: "Courts seldom undertake, in any case, to pass upon the validity of legislation where the question is not made by the parties. Their habit is to meet questions of that kind when they are raised, but not to anticipate them. Until then, they will construe the acts presented for consideration, define their meaning, and enforce their provisions. The fact that acts may in this way have been often before the court, is never deemed a reason for not subsequently considering their validity when that question is presented. Previous adjudications upon other points do not operate as an estoppel against the parties in new cases, nor conclude the court upon the constitutionality of the acts, because that point might have been raised and determined in the first instance."

In that case, Boyd was indicted under a statute of Alabama prohibiting lotteries, and relied for his defence on the privileges conferred by an act passed in October, 1868, which had been repealed by an act passed in 1871. Under a previous indictment against the same person it had been held by the Supreme

Court of the state that, inasmuch as by the terms of the act of 1868 a contract had been created between the state and Boyd, the repealing act was void as to him, and he was consequently acquitted. But in the second case, the court held that the act of 1868 was unconstitutional, and therefore conferred no rights upon Boyd, either by contract or otherwise, and hence it furnished no ground of defence, and that the former decision did not estop the state from raising the question of the constitutionality of the act of 1868. He was accordingly convicted, and the judgment was affirmed by the Supreme Court of the United States.

But appellants also contend that the decision of this court in the *Bond Debt Cases* was erroneous, and should now be reversed. First, as to the constitutionality of the act to authorize a loan for the relief of the treasury. The constitution of 1868, art. IX., sec. 7, provides that, "for the purpose of defraying extraordinary expenditures, the state may contract public debts, but such debts shall be authorized by law for some single object to be distinctly specified therein." It does seem to us that nothing can be clearer than that the act to authorize a loan for the relief of the treasury violates both of these clauses of the constitution. The body of the act affords no more information as to the object of the loan than the title; and for all practical purposes it might just as well have been entitled, an act to authorize a loan for the uses of the state government; for that was in fact the real object of the act. The debt thereby attempted to be contracted was certainly not *"for some single object,"* and such object was not "distinctly specified in the act."

The purpose of this provision of the constitution undoubtedly was to indicate to the tax-payers, when it was proposed to create a loan, the precise purpose to which the money to be borrowed was to be applied; and when the purpose declared by the act is expressed in the general terms "for the relief of the treasury," it afforded no indication whatever of the particular object to which the borrowed money was to be applied. On the contrary, when the money was paid into the treasury, as the terms of the act necessarily implied it was to be, it would become applicable, and undoubtedly was applied, to any of the various demands that might be made upon the treasury.

It is equally clear that the debt sought to be created by this act was not for any "extraordinary expenditure," for provision had already been made for the redemption of the "bills receivable" by an act passed August 26, 1868 (14 *Stat.*, 17), for the payment of the interest then in arrear on the public debt by an act passed on the same day (14 *Stat.*, 18), and for funding the outstanding bills of the bank of the state by an act passed September 15, 1868 (14 *Stat.*, 22), and we are not aware of any other expenditures which the legislature was then called upon to provide for, which could with any propriety be classed amongst "extraordinary expenditures," and none such have been suggested to us. The inevitable inference which accords with the well known facts is, that the object of this act was to raise money for the *current* demands on the treasury to meet the *ordinary* expenses of the state government, and therefore plainly in violation of the constitution.

The position taken by one of the counsel for appellants, that the question whether a debt proposed to be contracted is for the purpose of defraying an ordinary or extraordinary expenditure is one exclusively for the determination of the legislature, and the fact that they have authorized the loan must be regarded as sufficient evidence that its object was to meet an extraordinary expenditure, would, it seems to us, render the constitutional provision wholly nugatory. Such a provision was undoubtedly inserted as a check upon the power of the legislature to contract public debts, and it follows, necessarily, that it cannot determine conclusively the limits of its power in this respect; for otherwise there would be no check upon its power except its own will.

Next, as to the second issue of bonds for the payment of the interest on the public debt, we think it equally clear that there was no shadow of authority for such issue, and therefore that the bonds of that issue never did constitute valid obligations of the state. It will be observed that the question is *not* what the governor *might* have lawfully done under the authority of "an act to authorize a state loan to pay interest on the public debt" (14 *Stat.*, 18), but the question is whether he had any lawful authority for what he *did* do. The question is not whether, under the peculiar phraseology of the act, the governor was lim-

ited to the issue of bonds to the amount of one million of dollars, or whether he might not have issued as many bonds as would be necessary to raise that amount of money, provided he should deem such an amount necessary to pay the interest on the public debt, but the question is whether, after having made one issue of a million of dollars in bonds, he had any authority six or eight months afterwards to make a second issue of the same amount for the purpose of retiring the first issue, on account of some objectionable words used in the bonds of the first issue, the undisputed testimony showing that to be the sole object of the second issue.

It is quite clear that the act in question does not even purport to contain any authority for the exercise of such a power. The legislature, under the provisions of section 10 of article IX., might have provided by law for the substitution of one set of bonds for another, and possibly might have authorized the governor to make such substitution; but they did not do so, and we do not see by what authority the governor, or any other officer of the state, could, in the absence of any legislation authorizing it, assume to exercise such a power; and hence the bonds so substituted by the governor, without any authority whatever, cannot constitute any part of the valid obligations of the state. But even if we could hold, in disregard of the testimony, that such was not the object of the second issue of the bonds, but that they were designed to create a new and additional debt of the state, then it is equally clear that the act contains no shadow of authority for the creation of such new and additional debt. If the governor could lawfully make a second issue, we see no reason why he might not make a third or fourth, or an indefinite number of issues—there being just as much authority, under the terms of the act, for a fourth issue as there is for a second, and certainly a construction leading to such a result cannot be regarded as a correct one.

Our next inquiry is as to the effect of the act of December 22, 1873 (15 *Stat.*, 518), commonly called the "consolidation act." It is conceded that this act was not passed by the constitutional majority necessary for the creation of a public debt, and that it was not submitted to a vote of the people, as required by article

XVI. of the constitution, adopted January 29, 1873 (15 *Stat.*, 466), and therefore nothing would seem to be clearer than that such act cannot have the effect of creating "any further debt or obligation" on the part of the state, and, as we said in the *Bond Debt Cases*, "must be regarded as simply a scheme for the readjustment of the *then existing* debt." It cannot have the effect of making anything a debt of the state which was not then a valid obligation of the state.

The argument that the purpose and effect of the act was to *reduce*, and not to *increase*, the debt of the state, and therefore it was unnecessary that it should have been passed by a two-thirds vote, or submitted to a vote of the people, is not in our judgment entitled to any weight. · The constitution having prescribed the only way in which a debt of the state can be contracted, any attempt by the legislature to create one in any other way must necessarily be futile, even though the legislature may at the same time, and by the same act, make such provisions as that the debt of the state, to a larger amount than the proposed new debt, shall be paid or otherwise extinguished. If there is a lack of power to create the new debt, that cannot be supplied by the payment of an old debt, but can only be supplied by complying with the requirements of the constitution. So that even if it be conceded that the effect of the "consolidation act," fully carried out, would be to reduce the gross amount of the debt of the state, yet it would by no means follow that bonds originally issued without constitutional authority would thereby become valid obligations of the state. They would still continue to be, as they were before, evidences of debt not contracted by the state in the only mode in which it could contract, and therefore not valid obligations of the state.

But it is contended that by the terms of the "consolidation act" a contract of compromise was entered into by the state with its bondholders, which is binding upon the state. It seems to us that the argument in support of this position wholly ignores the important and vital distinction between a *state* and the *legislature* of a state, and assumes that the latter is invested with supreme power so far as making contracts for the state is concerned. This, as we have seen, is an entire mistake, and that, on the con-

trary, the power of the legislature in contracting a public debt is limited and controlled by the express terms of the constitution. It will not be denied that it is essential to the validity of any contract, whether of compromise or otherwise, that there should be power in the contracting parties to make the contract in question. Now, as the legislature in undertaking to pass the "consolidation act" did not pursue the mode prescribed by the constitution, in which alone any debt of the state could be contracted, any contract based upon that act, whether by compromise or otherwise, purporting to fix anything upon the state as a debt which was not so before, was without authority, and an absolute nullity.

The whole question is one of power. The very object of the constitutional provisions was to place restrictions upon the power of the legislature to contract public debts, and to say that the legislature could, by the act of March 13, 1872 (15 *Stat.*, 278), commonly called the "validating act," or by the "consolidation act," neither of which was passed by the requisite constitutional majority, make that a valid debt of the state which was not so before, would be to say that the very body whose power was intended to be restricted by these constitutional provisions could by these means evade and utterly disregard such restrictions.

Again, it is urged that the "consolidation act" must be regarded as a proposition by the state to its bondholders for a compromise of doubtful rights, and that the state having received all the benefits, must bear all the burdens of the arrangement. Without repeating here what we have just said as to the lack of power on the part of the legislature to make any such arrangement, in so far as it involved the creation or acknowledgment of any new debt on the part of the state, we think such a view is based upon an entire misconception of the terms of the "consolidation act." It was not a proposition to the bondholders as *a class*, or to the holders of any particular issue of bonds, that if they, or even a majority of them, would surrender all their bonds, new ones would be issued to them for one half of their face value, with the additional advantages proposed by the act, but it was a proposition addressed to each *individual bondholder*, and did not even involve the necessity that such individual bondholder should surrender *all*

of his bonds before he would be entitled to exchange or fund any
of them under the act.

For example, if A. held bonds the validity of which has never
been questioned, and also other bonds issued under the act to
authorize a loan for the relief of the treasury, he might, under
the terms of the "consolidation act," have retained the former
and funded the latter, as there is not a word in the act to pre-
vent him from so doing.   It is an entire mistake, therefore, to
say that the holders of bonds were induced to fund their unques-
tioned bonds by the opportunity offered them of funding those
which might be questioned, and thus a final composition was had
between the state and its bondholders.   There is nothing in the
act to authorize the assumption that any such inducement was
held out to the bondholders, and certainly nothing whatever to
indicate that the state required, as a consideration for funding
bonds that might be questioned, the surrender of other unques-
tionable bonds.

Indeed, there is nothing in the act to indicate that the legisla-
ture regarded *any* of the bonds, the funding of which was therein
provided for, as questionable obligations of the state; and, on
the contrary, the only bonds which seem to have been so re-
garded—a very large amount of the "conversion bonds"—were
"declared to be absolutely null and void."   So that it is difficult
to conceive how either the legislature or the bondholders could
then have regarded the "consolidation act" as a proposition for
the compromise of *doubtful* claims, and that the surrender of
unquestioned bonds should be regarded as a consideration for the
privilege of funding those that were questionable.   When, there-
fore, a bondholder surrendered, for the purpose of funding, in-
valid bonds, he parted with something which was of no value,
and could, therefore, constitute no consideration for a contract,
and the bonds which he received in exchange therefor rest upon
no better foundation than those which he surrendered.

We do not think the "*Lost Bonds Case*" (15 *S. C.*, 224),
relied upon by the appellants, is in point.   In the first place, in
that case there was no lack of power to make the contract; and,
in the second place, it is very manifest that the arrangement there
entered into was entered into as a whole, and as a compromise of

*disputed* claims. In fact, that case turned upon the question whether the arrangement there brought in question was intended as payment or satisfaction, or whether it was intended as mere substitution of one class of bonds for the other, and it was held that the intention was payment, and not substitution.

We have carefully considered the various cases cited by appellants, decided by the Supreme Court of the United States since our decision in the *Bond Debt Cases* was rendered, and we are unable to discover any conflict between the points there decided and the principles established by such cases; and after a careful consideration of the whole matter, we can see no reason why the former decision of this court should be overruled.

The judgment of this court is, that the judgment of the Circuit Court, in each of the cases above stated, be affirmed.