## COUNTY OF CASS *v.* JOHNSTON.

1. The provisions of the act of the General Assembly of Missouri, entitled "An Act to facilitate the construction of railroads in the State of Missouri," approved March 23, 1868, commonly known as the "Township Aid Act," which authorize a subscription to the capital stock of railway companies by a township, whenever it appears, by the returns of an election duly called for that purpose, "that not less than two-thirds of the qualified voters of the township voting at such election are in favor of such subscription," are not repugnant to sect. 14, art. 11, of the Constitution of that State, adopted in 1865, which ordains that the General Assembly shall not authorize any county, city, or town to become a stockholder in, or to loan its credit to, any company, association, or corporation, unless two-thirds of the qualified voters of such county, city, or town, at a regular or special election to be held therein, shall assent thereto.

2. *Harshman* v. *Bates County*, 92 U. S. 569, so far as it conflicts herewith, is overruled.

3. All qualified voters who absent themselves from an election held on public notice duly given are presumed to assent to the expressed will of the majority of those voting, unless the law providing for the election otherwise declares.

4. It is not an objection to the validity of the bonds issued under that act that the railroad company, to the capital stock of which the subscription was made by the county court on behalf of the township, was not incorporated until the day when the election took place.

5. On the bonds in question in this suit the judgment was properly rendered by the court below against the county, to be enforced, if necessary, by *mandamus* against the county court or the judges thereof, to compel the levy and collection of a tax in accordance with the provisions of that act.

ERROR to the Circuit Court of the United States for the Western District of Missouri.

Johnston, a citizen of Iowa, brought this action Sept. 3, 1874, against the "County of Cass, trustee for Camp Branch Township in said county, State of Missouri," to recover the amount of certain overdue coupons attached to bonds whereof he alleged that he was the lawful holder. A copy of one of the bonds and of a coupon annexed thereto is as follows: —

' UNITED STATES OF AMERICA,
          " *State of Missouri.*

               "CASS COUNTY BOND.

"No. 53.]          Interest ten per cent per annum.          [$500.

"Know all men by these presents, that the County of Cass, in the State of Missouri, acknowledges itself indebted and firmly

bound to the St. Louis and Santa Fé Railroad Company, Missouri division, in the sum of $500, which the said county of Cass, for and on account of Camp Branch Township, for value received, hereby promises to pay said company, or bearer, at the banking-house of Northrup & Chick, in the city of New York, and State of New York, ten years after date, with interest thereon from the date hereof at the rate of ten per cent per annum, payable semiannually on the eleventh days of January and July of each year, on the presentation and delivery at said banking-house of Northrup & Chick, in said city of New York, State of New York, of the coupons of interest hereto attached.

"This bond is issued pursuant to an order of the county court of said County of Cass, made by authority of an act of the General Assembly of the State of Missouri, entitled 'An Act to facilitate the construction of railroads in the State of Missouri,' and approved on the twenty-third day of March, A.D. 1868, and authorized by a vote of more than two-thirds of the voters of said township.

"In testimony whereof, the said County of Cass has executed this bond by the presiding justice of the county court of said county, under the order of said court, signing his name hereto, and by the clerk of said court, under the order thereof, attesting the same and affixing hereto the seal of said court,

"This done at the office of the clerk of said court, this eleventh day of July, A.D. 1870.

[SEAL.]                              "JEHIEL C. STEVENSON,
                     "Presiding Justice of the County Court of Cass County, Mo.
"C. H. DORE,
      "Clerk County Court Cass County, Mo."

"HARRISONVILLE, CASS COUNTY, July 11, 1870.

"The County of Cass promises to pay the sum of $25 on the eleventh day of January, 1873, being interest on bond No. 53, for $500, payable at the banking-house of Northrup & Chick, in the city of New York, State of New York.

                                     "C. H. DORE,
                  "Clerk of the County Court of Cass County, Mo."

The act referred to in the bond is generally known as "The Township Aid Act." The first, second, third, and fifth sections are as follows:—

"SECTION 1. Whenever twenty-five persons, tax-payers and residents, in any municipal township, for election purposes, in any county in this State, shall petition the county court of such county, setting forth their desire, as a township, to subscribe to the capital

stock of any railroad company in this State, building or proposing to build a railroad into, through, or near such township, and stating the amount of such subscription, and the terms and conditions on which they desire such subscription shall be made, it shall be the duty of the county court, as soon as may be thereafter, to order an election to be held in such township, to determine if such subscription shall be made; which election shall be conducted. and returns made in accordance with the law controlling general and special elections; and if it shall appear, from the returns of such election, that not less than two-thirds of the qualified voters of such township voting at such election are in favor of such subscription, it shall be the duty of the county court to make such subscription in behalf of such township, according to the terms and conditions thereof, and if such conditions provide for the issue of bonds in payment of such subscription, the county court shall issue such bonds, in the name of the county, with coupons for interest attached, but the rate of interest shall not exceed ten per cent per annum; and the same shall be delivered to the railroad company.

" Sect. 2. In order to meet the payments on account of the subscription to the stock, according to its terms, or to pay the interest and principal on any bond which may be issued on account of such subscription, the county court shall, from time to time, levy and cause to be collected, in the same manner as county taxes, a special tax, which shall be levied on all the real estate lying within the township making the subscription, in accordance with the valuation then last made by the county assessor for county purposes.

" Sect. 3. The county treasurer shall be authorized and required to receive and collect, of the sheriff of the county, the income from the tax provided in the previous section, and to apply the same to the payment of the stock subscription according to its terms, or to the payments of interest and principal on the bonds, should any be issued in payment of such subscription; he shall pay all interest on such bonds, out of any money in the treasury collected for this purpose, by the tax so levied, as the same becomes due, and also the bonds as they mature, which shall be cancelled by the county court; and this service shall be considered a part of his duty as county treasurer."

" Sect. 5. In all cases hereafter, where a railroad or branch railroad in this State shall be built, in whole or in part, by subscriptions to its stock, by counties, cities, or townships, the proceeds of all State and county taxes, levied upon such railroad company or branch so built, or the property thereof, shall be paid into the treasury of

the counties where collected, and the county treasurers shall apportion the same, according to their several subscriptions, to such counties, cities, or townships so subscribing stock, until the whole amount of such subscription is refunded to them; and such sums so apportioned shall be paid over to the county or city treasurer, and applied to the payment of the interest and principal of the bonds issued by such county or city on account of their subscription stock as aforesaid, if any are outstanding, and, if not, it shall by them be placed to the credit of the school fund in such county, city, or township."

The remaining sections do not affect any question here involved. They declare when the act shall take effect, and provide for granting to tax-payers certificates convertible into railway stock.

The Constitution of Missouri took effect July 4, 1865; and sect. 14, art. 11, is as follows: —

"The General Assembly shall not authorize any county, city, or town to become a stockholder in, or to loan its credit to, any company, association, or corporation, unless two-thirds of the qualified voters of such county, city, or town, at a regular or special election, to be held therein, shall assent thereto."

In 1871, the legislature of Missouri so amended sect. 2 of the Township Aid Act of 1868 as to make the tax therein provided for a tax upon all the real estate and personal property within the township. The county answered, that said bonds were issued in payment of a pretended subscription by said county in behalf of said Camp Branch Township, to the St. Louis and Santa Fé Railroad Company, under the authority of the act of March 23, 1868, and that prior to the date of them the township had no authority to subscribe for stock in said company or issue bonds therefor, or to have the same done for it by the county court; that prior to April 20, 1869, said company had not been organized, that on March 13, 1869, twenty-five voters of said township filed a petition, setting forth the desire of said township to subscribe —— dollars to the capital stock of the St. Louis and Santa Fé Railroad Company, proposed to be organized, to build a railroad through said township, said subscription to be paid in bonds to be issued by said county court for and on account of the township; that on that day the court ordered an election

in said township to be held on April 20, 1869; that on April 20, 1869, articles of incorporation were filed in the office of the secretary of state as provided by law, and thereby said company in said State became incorporated; that at the election so held two-thirds of the qualified voters of the township did not vote in favor of the subscription, although more than two-thirds of them voted at such election; and that by reason of the premises said bonds were null and void.

The plaintiff demurred to the answer; and, the demurrer having been sustained, judgment was rendered that the plaintiff recover of " said county, trustee for said township," the amount of said coupons, with interest thereon and costs, and that said county do pay the same " out and from taxes levied on the taxable property of said township."

The county thereupon sued out this writ of error.

The case was argued by *Mr. Willard P. Hall* and *Mr. John C. Gage* for the plaintiff in error, and by *Mr. John B. Henderson* for the defendant in error.

The plaintiff in error submitted the following propositions:

1. The Township Aid Act of 1868, under which the bonds in suit were issued, is repugnant to the Constitution of Missouri of 1865. It authorizes a municipal subscription to the capital stock of railroad companies, if two-thirds of the qualified voters voting at an election held under its provisions are in favor of it, whereas the Constitution requires the assent of two-thirds of all the qualified voters to render such subscription valid. Sufficient notice of this objection appears in the recitals of the bonds to put the holder on inquiry. *State* v. *Winkelmeier*, 35 Mo. 103; *State* v. *Sutterfield*, 54 id. 391; *Harshman* v. *Bates County*, 92 U. S. 569.

2. The record shows that the bonds were issued in payment of a subscription, by the township, to the capital stock of a railroad company which had no existence when the tax-payers petitioned for an election to take the sense of the people upon the question of the subscription, and when the election was ordered. They are, therefore, invalid, even in the hands of an innocent holder. *Rubey* v. *Shain et al.*, 54 Mo. 207; *The People* v. *Franklin*, 5 Lans. (N. Y.) 129.

3. The bonds are to all intents and purposes township, not

county, bonds. The county has incurred no liability to pay them. They are to be paid out of a special fund, derived from a tax upon the real and personal property within the township. The levy of that tax is imposed on the county court. A *mandamus* to compel the requisite levy is the appropriate and exclusive remedy of the bond-holder. An action on them will not lie against the county, and the judgment rendered in this case is evidently erroneous. *The State* v. *Linn County*, 44 Mo. 504; *State* v. *Justices of Bollinger County*, 48 id. 475.

MR. CHIEF JUSTICE WAITE delivered the opinion of the court.

The first question presented for our determination in this case is, whether the "Township Aid Act" of Missouri is repugnant to art. 11, sect. 14, of the Constitution of that State, inasmuch as it authorizes subscriptions by townships to the capital stock of railroad companies whenever two-thirds of the qualified voters of the township, voting at an election called for that purpose, shall vote in favor of the subscription, while the Constitution prohibits such a subscription, "unless two-thirds of the qualified voters of the . . . town, at a regular or special election to be held therein, shall assent thereto."

In *Harshman* v. *Bates County*, 92 U. S. 569, we incidentally decided the act to be unconstitutional; but the point then specially in controversy was as to the applicability of this constitutional prohibition to township organizations. It was impliedly conceded upon the argument that, if the Constitution did apply, the law could not be sustained; and we accepted this concession as truly stating the law of Missouri. Now, however, the question is directly presented, whether the provisions of the Constitution and the statute are not substantially the same. On the one hand, it is contended that the Constitution requires the actual vote of two-thirds of the qualified voters of the township in favor of the subscription; and, on the other, that the requisite assent is obtained if two-thirds of those voting at the prescribed election shall vote to that effect.

The Supreme Court of Missouri has often been called upon to construe and give effect to this statute, and has never in a single instance expressed a doubt as to its validity. The first

case was that of *The State* v. *Linn County*, 44 Mo. 504, decided in 1869, the year after the law was passed. That was an application for a *mandamus* to compel the county court to issue bonds upon a subscription made pursuant to a vote under the law; and it was contended that the act was repugnant to art. 11, sect. 14, of the Constitution, because the bonds to be issued were the bonds of the county and not of the township, and the voters of the county had not given their assent; but the court held that they were the bonds of the township, and granted the writ. Following this are the cases of *Ranney* v. *Baeder*, 50 Mo. 600; *McPike* v. *Pen*, 51 id. 63, decided in 1872; *State* v. *Cunningham*, 51 id. 479; *Rubey* v. *Shain*, 54 id. 207, decided in 1873; *State* v. *Bates County*, 57 id. 70, decided in 1874; *State* v. *Clarkson*, 59 id. 149, decided in 1875; *State* v. *Daviess County*, 64 id. 31; and *State* v. *Cooper County*, id. 170, decided in 1876, — in all of which the act was in some form brought under consideration, and in no one was there a suggestion of its unconstitutionality by either court or counsel.

It is true that the objection now made to the law was in no case presented or considered; but this is sufficiently explained by the fact that in other cases a construction adverse to such a position had been given to language similar to that employed in the constitutional prohibition. In *State* v. *Winkelmeier*, 35 id. 103, decided in 1864, just previous to the adoption of the Constitution, under a law which empowered the city authorities of St. Louis to grant permission for the opening of establishments for the sale of refreshments on any day in the week, " whenever a majority of the legal voters of the city " authorized them to do so, it was held that there must be a majority of the voters participating in the election at which the vote was taken, and not merely a majority of those voting upon that particular question. The judge who delivered the opinion of the court did, indeed, say, " The act expressly requires a majority of the legal voters; that is, of all the legal voters of the city, and not merely of all those who at a particular time choose to vote upon the question." But this must be read in connection with what follows, where it is said that " it appeared that more than thirteen thousand voters participated in that election, and that only five thousand and thirty-five persons

voted in favor of giving to the city authority, . . . and two thousand and one persons voted against it. . . . It is evident that the vote of five thousand out of thirteen thousand is not the vote of a majority." Taking the opinion as a whole, it is apparent that there was no intention of deciding that resort must be had elsewhere than to the records of the election at which the vote was taken to ascertain whether the requisite majority had been obtained. But, however this may be, in 1866 a similar question was presented to the same court in *State* v. *Mayor of St. Joseph*, 37 id. 270. There it was provided that the mayor and council of St. Joseph should cause all propositions " to create a debt by borrowing money," to be submitted " to a vote of the qualified voters of the city," and that in all such cases it should require "two-thirds of such qualified voters to sanction the same." A proposition to borrow money for the improvement of streets was submitted to a vote of the voters at an election called for that purpose, and resulted in a majority in favor of the measure. The mayor declined signing the necessary bonds, because " he was in doubt whether the matter was to be determined by two-thirds of all the votes polled at the special election, or by two-thirds of all the voters resident in the city, absolutely, whether voting or not." Thereupon a suit was instituted to settle this question, and to compel the mayor, by *mandamus*, to issue the bonds. In giving its decision, the court said : " We think it was sufficient that two-thirds of all the qualified voters who voted at the special election, authorized for the express purpose of determining that question, on public notice duly given, voted in favor of the proposition. This was the mode provided by law for ascertaining the sense of the qualified voters of the city upon that question. There would appear to be no other practicable way in which the matter could be determined." The writ of *mandamus* was accordingly issued. The same year the question came up again in *State* v. *Binder*, 38 id. 450. In that case the point arose under the refreshment act of St. Louis, which was considered in *State* v. *Winkelmeier*. It appeared that the authority to grant the permission in question was given at a special election called for that purpose, and that out of a vote of seven thousand and eighty-five, five thousand and fifty-one

were in favor of the grant, and two thousand and thirty-four against it. The cases of *State* v. *Winkelmeier* and *State* v. *St. Joseph* were both referred to; and, after quoting from the opinion in the latter case, it was said: "We think the case made here comes within the reasoning and the principles of that decision, namely, that an election of this kind, authorized for the very purpose of determining that question, on public notice duly given, was the mode contemplated by the legislature, as well as by the law, for ascertaining the sense of the legal voters upon the question submitted, and that there could not well be any other practicable way in which such a matter could be determined." These decisions had all been made, and had never been questioned, when the act of 1868, now under consideration, was passed. They were also in force, as evidence of the law of the State, when the bonds in controversy were issued; and, so far as we are advised, there has been no disposition since on the part of the courts of the State to modify them. In *State* v. *Sutterfield*, 54 id. 391, the question was as to the construction of another clause in the Constitution; and the decision was placed expressly on the ground of a difference between the two provisions. That court has in the strongest language intimated its unwillingness to interfere with its previous adjudications when property has been acquired or money invested under them. *Smith* v. *Clark County*, id. 58; *State* v. *Sutterfield*, *supra*.

In *St. Joseph Township* v. *Rogers*, 16 Wall. 644, this court gave the same construction to the phrase, "a majority of the legal voters of a township," as used in an Illinois municipal aid statute; and Mr. Justice Clifford, in delivering the opinion, uses this language: "It is insisted by the plaintiff that the legislature, in adopting the phrase, 'a majority of the legal voters of the township,' intended to require only a majority of the legal voters of the township voting at an election notified and held to ascertain whether the proposition to subscribe for the stock of the company should be accepted or rejected; and the court is of the opinion that such is the true meaning of the enactment, as the question would necessarily be ascertained by a count of the ballot." Among other authorities cited in support of this proposition is the case of *State* v. *Mayor of St.*

*Joseph, supra.* This we understand to be the established rule as to the effect of elections, in the absence of any statutory regulation to the contrary. All qualified voters who absent themselves from an election duly called are presumed to assent to the expressed will of the majority of those voting, unless the law providing for the election otherwise declares. Any other rule would be productive of the greatest inconvenience, and ought not to be adopted, unless the legislative will to that effect is clearly expressed. *Louisville & Nashville Railroad Co.* v. *The County Court of Davidson et al.*, 1 Sneed (Tenn.), 638; *Taylor* v. *Taylor*, 10 Minn. 107; *People* v. *Warfield*, 20 Ill. 159; *People* v. *Garner*, 47 id. 246; *People* v. *Wiant*, 48 id. 263. We conclude, therefore, that the Supreme Court of Missouri, when it decided the case of *The State* v. *Linn County*, and held the law in question to be constitutional, did not overlook the objection which is now made, but considered it settled by previous adjudications. That case is, therefore, to be considered as conclusive upon this question, as well as upon that which was directly considered and decided, and, as a rule of State statutory and constitutional construction, is binding upon us. It follows that our decision in *Harshman* v. *Bates County*, in so far as it declares the law to be unconstitutional, must be overruled.

It is further insisted that the bonds sued upon are invalid, because the railroad company to which the subscription was voted was not incorporated until the day of the election; and *Rubey* v. *Shain*, 54 Mo. 207, is cited in support of this objection. That case only decides, if it is to be regarded as authority, that a subscription cannot be made by a township until the company is incorporated, or, rather, that township subscriptions cannot be used to bring the company into existence. They are, to use the language of the judge in his opinion, not to be made the "nucleus around which aid is to be gathered." Here the company had been incorporated when the subscription was made. The decision relied upon, therefore, does not apply, and we are not inclined to extend its operation. This makes it unnecessary to inquire whether this defence could be maintained as against an innocent holder.

It is finally objected, that, as the bonds are in fact the bonds of

the township, no action can be maintained upon them against the county. Without undertaking to decide what would be the appropriate form of proceeding to enforce the obligation in the State courts, it is sufficient to say that in the courts of the United States we are entirely satisfied with the conclusions reached by the court below, and that a judgment may be rendered against the county, to be enforced, if necessary, by *mandamus* against the county court or the judges thereof, to compel the levy and collection of a tax in accordance with the provisions of the law under which the bonds were issued. The reasoning of the learned circuit judge in *Jordan* v. *Cass County*, 3 Dill. 185, is to our minds perfectly conclusive upon this subject, and we content ourselves with a simple reference to that case as authority upon this point.

*Judgment affirmed.*

MR. JUSTICE BRADLEY, with whom concurred MR. JUSTICE MILLER, dissenting.

I feel obliged to adhere to the opinion given in *Harshman* v. *Bates County*, 92 U. S. 569. If the Missouri convention which framed the Constitution of 1865 desired to prevent municipal subscriptions to railroad and other enterprises, except by the consent of a majority of the people qualified to vote in the district to be affected, I do not see what language could have been adopted more apt for the purpose than that which is actually used in the fourteenth section of art. 11: "The General Assembly shall not authorize any county, city or town to become a stockholder in, or to loan its credit to, any company, association, or corporation, unless two-thirds of the qualified voters of such county, city, or town, at a regular or special election to be held therein, shall assent thereto." The literal meaning of this clause seems to me unmistakably to require two-thirds of the qualified voters, whether they vote or not. The language is just as strong as that of the twenty-fourth section of art. 4, which declares that "no bill shall be passed unless by the assent of a majority of all the members elected to each branch of the General Assembly." This clause has always been construed to mean that no law can be passed unless a majority of the members vote for it, whether all are

present or not. And the reason of the requirement in the former case is as strong as in the latter. The people who are to pay the taxes for raising a subscription to a railroad ought not to be subjected to that burden, unless the requisite majority of the class named, that is, the qualified voters, can be induced to give their assent to it. In the one case, as in the other, absence and failure to vote is equivalent to a dissent. I concede that if the Supreme Court of Missouri has given a contrary construction to the clause, which has become the settled law of the State, we should be governed by it. But I do not understand that this has been done. In *State* v. *Winkelmeier*, 35 Mo. 103, which was decided just before the adoption of the Constitution, the question arose upon the act of 1857, which declared that " the corporate authorities of the different cities in the county of St. Louis shall have the power, whenever a majority of the legal voters of the respective cities in said county authorize them to do so, to grant permission for the opening of any establishment within the corporate limits of said cities for the sale of refreshments on any day in the week." At an election in St. Louis, five thousand persons voted in favor of giving to the city authority to grant permission to open establishments for the sale of refreshments on Sunday, and two thousand voted against it. The court held, that, in order to confer the requisite authority under the act, it required " a majority of the legal voters, that is, of all the legal voters, of the city, and not merely of all those who might, at a particular time, choose to vote upon the question." This was the express language of the court; and as at that election more than thirteen thousand voters participated in voting for the officers to be elected, it was apparent from the election returns themselves, without looking further, that a majority of the legal voters of the city had not voted for the authority; and hence it was decided that no authority had been given. It is evident that the court would have come to the same conclusion had it been shown in any other way that less than a majority of the legal voters voted for the authority. The mode of ascertaining the whole number of legal voters was not prescribed by the law. In that case, it sufficiently appeared from the election returns themselves. There is no valid reason why the same conclusion should not

be deduced from a registry of the legal voters. The objection that some persons not entitled to vote may be registered has no force to my mind. If any one choose to raise that issue, it might be open for him to do so; but the registry would certainly furnish *prima facie* evidence of the number of legal or qualified voters.

After the Constitution was adopted, a case arose on that clause of the Constitution which declares, art. 4, sect. 30, ", that the General Assembly shall have no power to remove the county seat of any county, unless two-thirds of the qualified voters of the county, at a general election, shall vote in favor of such removal. This was the case of *State* v. *Sutterfield*, 54 id. 391; and the court, in an elaborate argument, again held that these terms require a positive vote in the affirmative of two-thirds of the qualified voters of the county; and the court expressly says, "There is no difficulty in ascertaining what that number is, since the same Constitution provides for a registration, and points out who the qualified voters are."

In the cases relied on by the defendant in error, the precise question now under consideration was not presented to the Supreme Court of Missouri. They mostly related to forms of phraseology different from that under consideration, and are distinguishable therefrom in several particulars, which it is unnecessary now to examine. The leading case of *The State* v. *Linn County*, 44 id. 504, was cursorily examined in *Harshman* v. *Bates County*. But, not desiring to prolong this opinion by entering into a critical examination of those cases, I will simply remark, that, taking them all together, the weight of authority in Missouri is, in my judgment, on the side of the interpretation which I still feel constrained to give to the constitutional clause in question.