ALASKA NATIVE ASSOCIATION OF
OREGON et al., Plaintiffs,

v.

Rogers C. B. MORTON et al.,
Defendants.

ALASKA FEDERATION OF NATIVES,
INTERNATIONAL et al., Plaintiffs,

v.

Rogers C. B. MORTON et al.,
Defendants.

Civ. A. Nos. 2133–73, 2141–73.

United States District Court,
District of Columbia,
Civil Division.

Dec. 23, 1974.

A. John Wabaunsee, Boulder, Colo., admitted pro hac vice, for ANAO.

A. Raymond Randolph, Jr., Miller, Cassidy, Larroca & Lewin, Washington, D. C., for AFNI.

Herbert Pittle, Atty., Dept. of Justice, Washington, D. C., for defendant Morton.

Kenneth C. Bass, III, Washington, D. C., for intervenor defendant Alaska Federation of Natives in No. 2141–73.

Stephen M. Truitt, Washington, D. C., for intervenor defendant Aleut Corporation in No. 2141–73.

## MEMORANDUM

GASCH, District Judge.

This matter is before the Court on cross-motions for summary judgment. It involves the construction of Section 7(c) of the Alaska Native Claims Settlement Act, 85 Stat. 688 et seq. (1971), 43 U.S.C. §§ 1601–1624, which provides for an election to determine whether a thirteenth region for non-resident Alaska Natives shall be established, and it involves the procedures of the Department of the Interior in carrying out the election.

Plaintiffs are two organizations for Alaska Natives residing in States other than Alaska: the Alaska Native Association of Oregon (ANAO) and the Alaska Federation of Natives, International (AFNI), and ten non-resident Alaska Natives. Defendants are the Secretary of the Department of the Interior and its agencies which are responsible for the implementation of the Act, and two intervenor defendants, the Alaska Federation of Natives (AFN), an organization which represents ten of the twelve Alaska regional corporations, and the Aleut Corporation, one of the twelve regional corporations.

In order to put the two legal issues before the Court in perspective, it is first necessary to review the Alaska Native Claims Settlement Act (the Act), especially that portion dealing with an election to determine whether a thirteenth region for non-resident Alaska Natives shall be established, and then describe the history of the election process.

## I.  THE ACT.

The purpose of the Alaska Native Claims Settlement Act is to meet the "immediate need for a fair and just settlement of all claims by Natives and Native groups of Alaska, based on aboriginal land claims." [1] " 'Native' means a citizen of the United States who is a person of one-fourth degree or more Alaska Indian . . . ." [2] The Act declares that all such claims are extinguished [3] and, as part of the legislative settlement, establishes an Alaska Native Fund (the Fund), which consists of $962,400,000 to be distributed to the Natives as part of the compensation for their claims. [4]

Pursuant to the Act, the State of Alaska was divided into twelve geographic regions "with each region composed as far as practicable of Natives having a common heritage and sharing common interests." [5] Regional Corporations for each of these twelve regions were thereafter established. [6] Each region was further subdivided into villages, and Village Corporations were established. [7] The Regional Corporations are the conduits through which the monies from the Fund are distributed to the Village Corporations and to the Natives who are stockholders of the corporations. [8]

For the purpose of enrolling Natives in the various regions, the Act directed the Secretary of the Interior to prepare a roll of all living Alaska Natives by December 18, 1973. [9] The roll was to show where each Native resided on the date of the 1970 census enumeration, and, if the Native was a permanent resident of Alaska, he was to be enrolled in the corresponding region in Alaska. [10]

The Act also provided that a thirteenth region and regional corporation would be established

1.  43 U.S.C. § 1601(a).

2.  43 U.S.C. § 1602(b).

3.  43 U.S.C. § 1603.

4.  43 U.S.C. § 1605(a).

5.  43 U.S.C. § 1606(a).

6.  43 U.S.C. § 1606(d).

7.  43 U.S.C. § 1607(a).

8.  43 U.S.C. §§ 1605(c), 1606(j).

9.  43 U.S.C. § 1604(a).

10.  43 U.S.C. § 1604(b).

[i]f a majority of all eligible Natives eighteen years of age or older who are not permanent residents of Alaska elect . . . to be enrolled in a thirteenth region for Natives who are non-residents of Alaska. . . . [11]

Therefore a non-resident Native might elect to be enrolled in one of the twelve Alaska regions *or* in a thirteenth region for non-resident Natives.[12] The thirteenth region, if established, would consist only of those non-resident Natives who had voted in favor of a thirteenth region.[13] If a thirteenth region were not established by a majority vote, each non-resident Native, regardless of his vote, would then be enrolled in one of the twelve Alaska regions [14] as one of "the class of stockholders who are not residents of . . . villages." [15]

After completion of the enrollment process, the money in the Fund "shall be distributed at the end of each three months of the fiscal year among the Regional Corporations . . . on the basis of the relative numbers of Natives enrolled in each region." [16] Non-resident Natives enrolled in a thirteenth region, if established, would receive not less than 50 percent of their per capita share of the amount distributed to their thirteenth Regional Corporation from the Fund.[17] Non-resident Natives enrolled in one of the twelve Alaska regions would receive from that Regional Corporation not less than 45 percent during the first five-year period following December 18, 1971, and 50 percent thereafter of their per capita share of the amount distributed to their Regional Corporation from the Fund, and also their per capita share of "all other net income" of that Corporation.[18] Such "other net income" specifically includes that income derived from the Corporation's own investments and resource development and also its proportionate share of 70 percent of all Alaska Regional Corporations' revenues from timber resources and subsurface estates.[19] However,

> an equitable portion of the amount distributed as dividends [to non-village-resident stockholders] may be withheld [by the Corporation] and combined with Village Corporation funds to finance projects that will benefit the region generally.[20]

It is the opinion of the plaintiffs, who are seeking the establishment of a thirteenth region, that non-resident Natives would receive more money in dividends through a thirteenth regional corporation, even though such a corporation's income would be limited to the Fund, because money distributed through the twelve Regional Corporations would be deflected from the stockholders to projects to benefit the local region. Obviously, non-resident Natives would not benefit from such local projects.

The defendants think that the additional income from the regions' resource development would more than compensate for any funding of local projects out of the Fund so that non-resident Natives would receive more money in dividends by belonging to one of the twelve Regional Corporations. The Court expresses no opinion as to which would be of greater financial benefit to non-resident Natives.

## II. THE ELECTION PROCESS.

On March 17, 1972, the Secretary of the Interior issued regulations for the enrollment of Alaska Natives. Applications provided by the Bureau of Indian Affairs were to be completed by all Natives and sub-

---

11. 43 U.S.C. § 1606(c).

12. 43 U.S.C. § 1604(c).

13. 43 U.S.C. § 1606(c).

14. 43 U.S.C. § 1604(c).

15. 43 U.S.C. § 1606(m).

16. 43 U.S.C. § 1605(c).

17. 43 U.S.C. § 1606(j).

18. 43 U.S.C. § 1606(j).

19. 43 U.S.C. § 1606(j).

20. 43 U.S.C. § 1606(m).

mitted to the Coordinating Office in Anchorage, Alaska, by March 30, 1973.[21]

### 1. Assistance.

The regulations also provided as follows:[22]

> Residents of Alaska: Enumerators shall be sent to all villages to assist in the completion and filing of applications and centers will be established in urban areas to furnish assistance in the completion and filing of applications. Persons who are missed by the enumerators may apply to the Coordinating Office by mail or in person.
>
> Nonresidents of Alaska: Natives not residing in Alaska shall be furnished application forms, together with instructions for completing the forms, upon request made to the Commissioner, the Area Director, or the Coordinator.

Enumerators were dispersed throughout Alaska to assist resident Natives in filling out the enrollment application. In the process of enrolling resident Natives, the enumerators discovered the names and addresses of Natives living outside of Alaska, and they mailed enrollment applications to them. Applications were also made available at all Area Offices of the Bureau of Indian Affairs. A public relations firm was retained to handle a media campaign designed to inform Natives living outside of Alaska about the Act. But non-resident Natives experienced difficulty in completing the application with only the assistance of the accompanying instruction sheets. Organizations of non-resident Natives sought the appointment of enumerators to assist Natives residing outside of Alaska. In Mid-February, 1973, just six weeks before the deadline for filing applications, nineteen Native enumerators were hired to serve Natives living outside of Alaska.

### 2. The Enrollment Application.

Non-resident Natives who procured enrollment forms received a packet containing a notice, an instruction sheet, and an application.

The notice advised the recipient:[23]

> This is your official enrollment form . . .. This form will be used to qualify you for your share of the Alaska Native Land Claim Settlement Act of 1971 . . .. All completed applications must be returned and received by the Coordinating Officer: [address] not later than March 30, 1973 . . ..

The non-resident Alaska Natives who live outside the State of Alaska will have the choice of establishing a 13th Region. The 13th Region will only come into existence if a majority of the non-resident Alaska Natives vote "yes" to be in the 13th Region. The only benefit members of the 13th Region will receive is a share of the $462.5 million in Federal funds and $500 million in revenues from the State of Alaska. Members of the 13th Region *will not share* in any of the *land* or *revenues* (money) derived from the yield of the 40 million acres of land that is owned by the Alaska Natives. If you choose to be enrolled in a village or region for which you qualify (see instructions, especially 16, on your enrollment form) you will be enrolled in that village or region of your choice if you vote "no." (Emphasis in original.)

The enrollment application sought the usual general information in the first fifteen columns: names of the members of the family, birthdates, birthplaces, etc., and the applicants' degree of Native blood.[24]

Column 16 of the application requested "Your Permanent Residence as of April 1, 1970." The accompanying instructions stated with reference to column 16:[25]

**21.** 25 C.F.R. § 43h.6(a)(d) (1972).

**22.** 25 C.F.R. § 43h.6(e)(f) (1972).

**23.** Appendix A, Memorandum of Points and Authorities in Support of (AFNI) Plaintiffs' Motion for a Preliminary Injunction.

**24.** Appendix B, *Id.*

**25.** Appendix A, *Id.*

*The place you name here is where you will be enrolled if you are found eligible under the requirements of the Act.* You need not have been physically present in that place on April 1, 1970, but you must have some ties back to that place as outlined in Section 43h.1(k) of the regulations. (Emphasis in original.)

Column 17 of the application requested "Your Permanent Residence as of date you complete this form." The accompanying instructions stated with reference to column 17:

If your permanent residence on April 1, 1970, and/or the date you file this form is outside the State of Alaska, questions 17 through 21 will determine the Region in which you are enrolled if you vote NO on the establishment of the 13th Region or if you vote YES and the 13th Region is not formed. Consult the enclosed map for approximate regional boundaries.

Columns 18–21 of the application acquire data to determine, pursuant to the Act and the regulations,[26] a non-resident Native's region in the event that a thirteenth region is not created.

Column 22 of the application asked, "Do you elect to establish and be enrolled in a 13th Region?" The accompanying instructions stated with reference to column 22:

Section 7(c) of the Act provides:

"If a majority of all eligible Natives eighteen years of age or older who are not permanent residents of Alaska elect, pursuant to subsection 5(c), to be enrolled in the thirteenth region for Natives who are non-residents of Alaska, the Secretary

shall establish such a region for the benefit of the Natives who elected to be enrolled therein, and they may establish a Regional Corporation pursuant to this Act."

The Joint Statement of the Committee of Conference states in Section I.B. 3:

"Natives who are not permanent residents of Alaska may, if they desire, organize a 13th Regional Corporation, rather than receive stock in one of the 12 Regional Corporations. The 13th Regional Corporation will receive its pro rata share of the $962,500,000 grant, but it will receive no land and will not share in the mineral revenues of the other Regional Corporations."

Non-resident Natives were bewildered by these confusing and contradictory instructions.[27] The confusion was so great that Interior decided not to count column 17 at all.[28] And the instructions accompanying column 22 gave no indication of any possible advantages to belonging to a thirteenth region, as those advantages have been alleged by the plaintiffs in this suit.[29] Only disadvantages were noticed.

### 3. The Deadline for Filing Applications.

For this reason the Department of the Interior, prior to the March 30 deadline, began telling non-resident Natives that if they filed their enrollment applications on time, they would be permitted to complete them later.[30]

The first extension date for amending applications was May 4, 1973, since such amendments "could be entered on the com-

**26.** 43 U.S.C. § 1604(b) and 25 C.F.R. § 43h.4(b) (1972).

**27.** Testimony of Robert Bruce, Office of Legislative Development, Bureau of Indian Affairs, in *Hearings on H.R. 12355 Before the Subcommittee on Indian Affairs of the House Committee on Interior and Insular Affairs,* 93d Cong., 2d Sess. 65 (February 4, 1974); Affidavit of Betty Anne Kadas, (ANAO) Plaintiffs' Motion for a Preliminary Injunction.

**28.** Testimony of Robert Bruce, *supra,* note 27.

**29.** *Supra,* at 5–6. Nor, for that matter, did Assistant Solicitor Charles Soller's Memorandum of May 4, 1972, to the Coordinator of Alaska Native Affairs, evaluating the advantages and disadvantages of a thirteenth Regional Corporation, Exhibit C to Defendants' Motion for Summary Judgment.

**30.** Answer to Interrogatory No. 20 by John Hope, Enrollment Coordinator for the Department of the Interior, filed as part of Defendants' April 11, 1974, response to the Order of December 19, 1973.

puter in time to appear on the May 15 printout."[31]

Then the date was extended to June 1.[32]

Still later "a determination was made" by the Department of the Interior that amendments should be filed by May 9.[33]

Finally, on August 8, 1973, an announcement appeared in the Federal Register that the deadline for filing amendments to enrollment applications was August 15, 1973.[34] A new regulation provided that

> Amendments to enrollment applications, or amended applications, will not be considered originally or on appeal unless filed (received by the Enrollment Office) on or before August 15, 1973. All such amendments or amended applications received subsequent to August 15, 1973, will be returned to the applicant without action.[35]

The Secretary's accompanying explanation stated that the August 15 deadline was "required in order to enable the processing of all applications, including amendments thereto, to be completed by the statutory deadline of December 18, 1973.[36]

#### 4. Action on the Amendments.

In spite of this regulation, amendments filed after May 9 were rejected because they were "not received in time to appear in the May 15 printout to villages."[37] They could only be counted if the Native chose to appeal the rejection. But "the 'appeals packet' accompanying the Enrollment Coordinator's rejection notice may [have] appear[ed] rather formidable,"[38] especially to poorly educated Natives.

In late July, 1973, the Enrollment Coordinator John Hope instructed his staff "not to change *any* thirteenth-region (column 22) votes because the statute requires the election to be made 'at the time he files an application for enrollment' . . . ."[39] (Emphasis added.) As a result, previously granted amendments of column 22, filed before May 9, were rejected, and the Natives' votes were changed back to their original vote.[40] Yet at the same time Secretary of the Interior Morton wrote Senator Jackson and Representative Meeds to assure them that *all* amendments received by May 9 were accepted.[41]

#### 5. The First Tabulations.

On November 8, 1973, the Department of the Interior announced that a thirteenth region would not be established because a majority of all eligible non-resident Alaska Natives had not elected to be enrolled in such a region.

A tabulation made by the Bureau of Indian Affairs' data center in Albuquerque,

---

**31.** John Hope's Answer to Interrogatory No. 22, *supra*, note 30.

**32.** Testimony of Robert Bruce, *Hearings, supra*, note 27, at 62; John Hope's Answer to Interrogatory No. 25, *supra*, note 30.

**33.** Letter from Secretary Morton to Senator Jackson and Representative Meeds, July 30, 1973, at 2, Exhibit to Affidavit of Charles M. Soller in support of Defendants' Motion for Summary Judgment.

**34.** 38 *Fed.Reg.* 21403–21404.

**35.** 25 C.F.R. § 43h.14 (1973).

**36.** 38 *Fed.Reg.* 21403.

**37.** Form letter of Enrollment Coordinator John Hope, Appendix D, (AFNI) Plaintiffs' Memorandum of Points and Authorities in Support of the Motion for a Preliminary Injunction.

**38.** Letter from Secretary Morton to Senator Jackson and Representative Meeds, *supra*, note 33, at 3.

**39.** First letter from Charles M. Soller, Assistant Solicitor, Department of the Interior, to Floyd L. France, Chief, General Litigation Section, Land and Natural Resources Division, the Department of Justice, April 10, 1974, at 2–3, filed on April 11, 1974, as part of Defendants' initial response to the Order of December 19, 1973.

**40.** Memorandum from Assistant Enrollment Coordinator George Walters to Charles M. Soller, May 15, 1974, at 1 ¶ 2, filed on June 24, 1974, as part of Defendants' response to the Order of December 19, 1973.

**41.** Letter from Secretary Morton to Senator Jackson and Representative Meeds, *supra*, note 33, at 2.

N.M. . . . indicates that of the 5,774 Natives eligible to vote for a 13th region, only 2,375 elected to be so enrolled.[42]

This led Senator Jackson to raise questions about the conduct of the election, including the propriety of including those who had abstained from voting (by leaving column 22 blank) in calculating the total vote. Secretary Morton explained in a letter to the Senator that

> It is . . . the Department's position that in calculating whether a majority of the eligible Natives elected to be enrolled in a thirteenth region, we have no legal alternative to the inclusion in the determinative formula of such Natives who had, at the time of filing their enrollment applications, the right or privilege of voting on the question. In no other way can we determine whether "a majority of all eligible Natives" favored such enrollment and the consequent establishment of a thirteenth region.[43]

Two further tabulations were made to include applications which had been on appeal at the time the preceding tabulation was announced. Neither changed the outcome.

On December 3 the second tabulation was announced:[44]

```
In favor of a 13th region    2,535
Against a 13th region        2,797
Abstaining                     559
Total eligible voters        5,891
```

On December 13 the third and final tabulation was announced:[45]

```
In favor of a 13th region    2,551
Against a 13th region        2,816
Abstaining                     585
Total eligible voters        5,952
```

## III. THE COURT ORDER AND ITS AFTERMATH.

On November 30, 1973, plaintiff Alaska Native Association of Oregon, an organization representing Alaska Natives residing in Oregon, filed a complaint for declaratory and injunctive relief and moved for a temporary restraining order against certifying the results of the election. On December 4 the Court denied the motion for a temporary restraining order.

On that same day plaintiff Alaska Federation of Natives, International, an organization representing Alaska Natives residing in States other than Alaska, filed a complaint for declaratory and injunctive relief and moved for a temporary restraining order enjoining the distribution of the first $130 million installment due the Alaska Natives and for a preliminary injunction ordering the Secretary of the Interior to amend the final roll. A temporary restraining order was granted on December 4 until a hearing could be held on December 17.

On December 19, 1973, the Court issued a Memorandum-Order. The temporary restraining order was dissolved and the first installment was permitted to be paid "upon representation by counsel for the government, that these funds can now be released without unduly prejudicing the future determination of the rights of non-resident Natives."[46]

The motion for a preliminary injunction was denied on the basis that plaintiffs would incur no irreparable harm from such denial provided the case would be speedily heard on its merits.

---

42. Department of Interior News Release, Appendix E to (AFNI) Plaintiffs' Memorandum in Support of the Motion for a Preliminary Injunction.

43. *Supra,* note 33.

44. Affidavit of Charles M. Soller, ¶ 7, *supra,* note 33.

45. Second letter from Charles M. Soller to Floyd L. France, filed on September 27, 1974, as part of Defendants' response to the Order of December 19, 1973.

46. Memorandum of December 19, 1973, at 5.

The two cases were consolidated and the motion of the Alaska Federation of Natives to intervene as defendants was granted. (A similar motion to intervene as defendant made by the Aleut Corporation was granted on January 11, 1974.)

Finally, the Court ordered

defendant Secretary of the Interior [to] take all steps necessary to insure that future distributions of the Alaska Native Fund to Regional Corporations can be adjusted so that if, upon further consideration this Court determines that the thirteenth Regional Corporation should be created, the stockholders of the potential thirteenth Regional Corporation will receive the amount that they would have been due if the thirteenth region were now established; [and]

that the Secretary, to assist this Court in its consideration of this case on the merits, examine and report to the Court as soon as possible the results of such examination of all enrollment applications to determine if amendments were filed or attempted to be filed and what effect these amendments would have as to the election results vis-a-vis the thirteenth region; [and]

that the Secretary contact, as soon as possible, all persons whose votes were registered as abstentions and determine the reasons that (1) these persons left enrollment columns blank, and (2) any other reason why these persons wished to abstain, and (3) what the vote of these persons would have been as to the creation of the thirteenth region had they voted.

On April 11, 1974, the government offered its first submission to the Court in response to the December 19 Order. This revealed that not even the inclusion of the amendments gave the thirteenth region a majority.

However, the plaintiffs pointed out numerous errors in the government's submission, and the defendants conceded that "there no doubt is substance to some of the criticisms contained in plaintiffs' response." [47] The defendants promised to "reexamine the material, make the necessary corrections and exert every effort within their competence and ability to furnish the information." [48]

On August 16, 1974, the government offered a further submission to the Court. This revealed that if all amendments of column 16 *and* column 22 filed on or before August 15, 1973, were counted, the result would be as follows: [49]

```
In favor of a 13th region    2,762
Against a 13th region        2,637
Abstaining                     530
Total eligible voters        5,929
```

[The government is continuing to receive information from those who abstained, explaining why they abstained and how they would have voted.]

## IV. SUMMARY JUDGMENT.

Motions for summary judgment have been filed by both plaintiffs, the federal defendants, and the two intervenor defendants. Plaintiffs ANAO contend that the government's conduct of the enrollment and election was arbitrary and capricious as a matter of law. They seek to have the election results set aside and a new election ordered. Plaintiffs AFNI contend that the government's refusal to count timely filed amendments was an abuse of discretion and that the statutory words, "a majority of all eligible Natives," refer, as a matter of law, only to those voting in column 22 for or against the establishment of a thirteenth region. They seek to have the amendments counted and a thirteenth region established.

---

**47.** Letter from Herbert Pittle, Esq., Counsel for the Defendants, to A. Raymond Randolph, Jr., Esq., Counsel for (AFNI) Plaintiffs, at 1 (April 30, 1974), cited in (AFNI) Plaintiffs' Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment, at 24.

**48.** *Ibid.*

**49.** Letter from Charles M. Soller to Herbert Pittle, August 15, 1974, at 5, filed on August 16, 1974, as part of Defendants' response to the Order of December 19, 1973.

The defendants and intervenor-defendants contend that the December 13, 1973, determination of the Department of the Interior that a thirteenth region should not be established had a rational basis, was correct as a matter of law, and should not be disturbed.

The cross-motions for summary judgment, then, raise two issues for the Court's determination:

1. Do the statutory words, "a majority of all eligible Natives," refer to all non-resident Natives who filed enrollment applications, including those who abstained from voting in column 22? Or do they refer only to those who voted in column 22?

2. Should the amendments filed on or before August 15, 1973, be counted?

From the facts stated in the preceding sections, on which all parties are in agreement, it is clear that if a thirteenth region is to be established by the enrollment and election process which has already taken place, the Court must find that the statutory words refer only to those who voted in column 22 *and* that the amendments filed on or before August 15, 1973, must be counted. For the Court to find against the plaintiffs on either issue, however, would preclude the establishment of a thirteenth region unless a new election is ordered. For reasons stated below, the Court finds for the plaintiffs on both issues and orders the creation of a thirteenth region.

### 1. The Statutory Language.

█ ˙ Section 7(c) of the Act, 43 U.S.C. § 1606(c) provides:

If a majority of all eligible Natives eighteen years of age or older who are not permanent residents of Alaska elect, pursuant to section 1604(c) of this title, to be enrolled in a thirteenth region for Natives who are non-residents of Alaska, the Secretary shall establish such a region for the benefit of the Natives who elected to be enrolled therein, and they may establish a Regional Corporation pursuant to this chapter.

The Department of the Interior has construed the words, "a majority of all eligible Natives," to refer to a majority of all non-resident Alaska Natives who submit enrollment applications, including those who did not vote in column 22 for or against the establishment of a thirteenth region. The effect of this construction is to make abstentions count as "no" votes. Under this construction there would be an insufficient number of votes favoring the establishment of a thirteenth region on both the December 13, 1973, and August 15, 1974, tabulations.[50]

This construction of the Act was not announced in any regulations. Nor was there any warning in the instructions applicable to column 22 that an abstention would be counted as a negative vote. It was implied for the first time in the Department of Interior News Release of November 8, 1973.[51] It was subsequently defended in Secretary Morton's letter to Senator Jackson and Representative Meeds.[52]

Yet, as plaintiffs point out, "[e]lection laws providing for approval of a proposal by a specified majority of the electorate have been generally construed as requiring only the consent of the specified majority of those participating in the election." *Virginian Railway Co. v. Systems Federation, No. 40*, 300 U.S. 515, 560, 57 S.Ct. 592, 605, 81 L.Ed. 789 (1937). "Any other rule would be productive of the greatest inconvenience, and ought not to be adopted, unless the legislative will to that effect is clearly expressed." *County of Cass v. Johnston*, 95 U.S. 360, 369, 24 L.Ed. 416 (1877). Federal courts have consistently followed this rule

---

**50.** In the December 13 tabulation, 2977 votes in favor of a thirteenth region would have been required out of the 5,952 enrollment applications submitted, *supra*, at 13; in the August 15 tabulation, 2965 votes in favor would have been required out of the 5,929 applications submitted, *supra*, at 13. Only 2,762 votes were cast in favor of a thirteenth region in that vote; 2,637 against. There were 530 abstentions.

**51.** *Supra*, at 13.

**52.** *Supra*, note 33.

in construing election statutes.[53] *Defendants have been unable to cite a single federal case to the contrary.* Following case law, "a majority of all eligible Natives" refers to a majority of all non-resident Alaska Natives who voted in column 22 for or against the establishment of a thirteenth region; abstentions would not be counted.

Since the defendants have no federal case law to support their construction of the Act, they rely on other arguments. First, the defendants urge that "great deference [should be given] to the interpretation given the statute by the officers or agency charged with its administration." *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). That is ordinarily true. But an interpretation that flies in the face of all existing federal case law cannot command great deference.

Secondly, defendants make much of the fact that the Conference Reports[54] and floor debates[55] reiterate that a thirteenth region will be created "if a majority of [all][56] eligible Natives" so elect. But this is simply the repetition of statutory language. It does not illuminate legislative intent or demonstrate a clear expression of the legislature that "a majority of [all] eligible Natives" means something other than a majority of Natives actually voting on the thirteenth region. Indeed, these same congressmen speak of being elected by a "majority" of voters living in their districts or states, even though they know full well that, more precisely stated, they are elected by a majority of those voters who actually go to the polls and vote.

Thirdly, defendants maintain that this situation is distinguishable from the kinds of elections on which the case law is based. In this election, "every non-resident enrollee eligible to vote in the thirteenth region question has 'been to the polls' . . .. The fact that some by design or neglect did not put an 'X' in the proper box should not even suggest that the voting statute should be interpreted other than literally."[57] But this overlooks the fact that the basis for computing a majority of votes on a particular proposition on a ballot is analogous to the basis for computing a majority of eligible voters in an election: a majority is determined on the basis of those voting on the particular proposition on the ballot, not on the number of ballots cast.[58]

---

**53.** Plaintiffs cite, e. g., *Virginian Railway Co. v. Systems Federation, No. 40*, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937) ("majority of any craft or class of employees shall have the right to determine"); *County of Cass v. Johnston*, 95 U.S. 360, 24 L.Ed. 416 (1877) ("unless two thirds of the qualified voters of the town . . shall assent thereto"); *Carroll County v. Smith*, 111 U.S. 556, 4 S.Ct. 539, 28 L.Ed. 517 (1884) ("if two thirds of said qualified voters be in favor of said subscription"); *NLRB v. Singleton Packing Corp.*, 418 F.2d 275 (5th Cir. 1969) ("selected . . . by the majority of the employees in the unit"); *NLRB v. Deutsch Co.*, 265 F.2d 473 (9th Cir. 1959) (same statute); *NLRB v. Standard Lime & Stone Co.*, 149 F.2d 435 (2d Cir. 1945) (same statute); *Euwema v. Todman*, 323 F.Supp. 167 (D.St.Croix 1971) ("majority of the qualified voters"). State cases are not as consistent.

**54.** H.R.Rep.No.92–746, 92nd Cong., 1st Sess. 39 (1971); S.Rep.No.92–581, 92nd Cong., 1st Sess. 6 (1971); U.S.Code Cong. & Admin.News 1971, p. 2192.

**55.** Remarks of Representative Aspinall, Chairman of the House Interior and Insular Affairs Committee, 117 Cong.Rec. 46781 (1971).

**56.** The House Conference Report, *supra*, note 54, includes the word "all" in its discussion of Section 5, "Enrollment", but omits the word "all" in its discussion of Section 7, "Regional Corporations".

**57.** Second letter of Charles Soller to Floyd L. France, *supra*, note 45, at 12.

**58.** 26 Am.Jur.2d Elections § 310 (1966): "In the absence of a statutory provision to the contrary, voters not attending the election or not voting on the matter submitted are presumed to assent to the expressed will of those attending and voting and are not to be taken into consideration in determining the result," (such a statutory provision must be "clearly expressed" according to *County of Cass, supra*, at 369), *citing, inter alia, Brannon v. Perkey*, 127 W.Va. 103, 31 S.E.2d 898 (1944). This case states the common law: "In the exercise of the right of suffrage a voter is sovereign and has the right to vote or refrain from doing so. . . In case a voter goes to an election but does not elect to exercise his full right of suffrage and fails to cast a vote as to any office, such ballot should be treated as a blank vote and not considered or taken into account in ascertaining the result of an election in so far as the

Finally, both defendant-intervenors cite, not a federal case, but a federal "authority." In 1935 the Secretary of the Interior construed comparable language in the Wheeler-Howard Act,[59] "a majority of the adult Indians," exactly as he has construed the language of this Act, that is, as requiring a majority of those eligible to vote. Attorney General Homer Cummings concurred in this interpretation.[60] Subsequently Congress amended the law to permit "a majority of those actually voting" to determine the issue.[61] Defendants cite this to show that "Congress knows how to achieve the result argued for by plaintiffs here, but has chosen language plainly at variance with [such] an intent . . .."[62] However, the floor debate in the House over the passage of this amendment discloses that the contrary is true. In explaining the reason for the amendment, Representative Rogers, its sponsor, said,

> This bill applies to the holding of elections under the Wheeler-Howard Act, which requires that a majority of the adult Indians of a tribe must vote against the Wheeler-Howard Act or the provisions of the act will be imposed upon them. *This was not the intent of Congress or the Department or the Indian Commissioner, but the law has been so interpreted.* This bill corrects that default and provides that a majority of the Indians voting in an election shall be all that is necessary to determine the matter. (Emphasis added).

79 Cong.Rec. 8269 (1935).

In other words, when Congress first said in the Wheeler-Howard Act "a majority of the adult Indians" voting, it *meant* what the common law and the Supreme Court have understood such a phrase to mean, namely, "a majority of [those actually] voting." The Court construes the similar language in the Alaska Native Claims Settlement Act, "a majority of all eligible Natives," in the same way as referring to those eligible Natives who actually voted on the thirteenth region proposition.

### 2. The Amendments.

According to the December 13, 1973, "final" tabulation, a thirteenth region was not established, even under the Court's construction of the statutory words, "a majority of all eligible Natives." However, if all the amendments filed on or before August 15, 1973, are counted, a thirteenth region will come into being.

The Act does not provide for amendments. Nor does it separate the act of enrolling from the act of voting on a thirteenth region. A non-resident Native is to cast his vote "on the date he files an application for enrollment."[63] Defendants claim this fact precluded the counting of column 22 (vote on a thirteenth region) amendments unless they were related to an error in law or fact in filling in column 16 (place of residence on April 1, 1970).

This Court stated in its Memorandum of December 19, 1973, that it

> cannot so narrowly construe this statutory language as to prevent the Secretary, in his discretion, from promulgating regulations, including provisions for amendment, that would allow the most fair and equitable election possible.[64]

The history of the enrollment and election process described above[65] cries out for just such an equitable remedy.

Non-resident Natives were dependent upon printed instruction sheets prepared by

---

same affects the office for which the voter has expressed no choice. . . ." at 902. See also *Euwema v. Todman, supra,* note 53.

**59.** 25 U.S.C. § 478.

**60.** Letters of Homer Cummings to the Secretary of the Interior, February 13, 1935, and April 19, 1935, Exhibits A and B of (Aleut) Defendant-Intervenor's Motion for Summary Judgment.

**61.** 25 U.S.C. § 478a.

**62.** (Aleut) Defendant-Intervenor's Motion for Summary Judgment at 5.

**63.** 43 U.S.C. § 1604(c).

**64.** At 4–5.

**65.** *Supra,* at 6–16.

the Bureau of Indian Affairs for guidance in filling out the enrollment application. These instructions were confusing, contradictory, and one-sided. In column 16 [66] the Native listed his permanent residence as of April 1, 1970. The instructions told him that this—his 1970 residence—determined where he would be enrolled. In column 17,[67] the Native listed his permanent residence as of the date he submitted his application. The instructions told him that this date, or the 1970 date, determined where he would be enrolled if a thirteenth region were not created or if he voted "no" in column 22. What would happen if his answers to these questions conflicted with each other, as might happen if he had moved in or out of Alaska between 1970 and the date he submitted his application, was not explained. What did happen, in fact, is that column 17 was ignored in determining residence. The instructions accompanying column 22 [68] indicated the detriment of belonging to a thirteenth region, but nothing was said about any benefit. At best this was insufficient information to enable a Native to make an informed and intelligent decision. At worst it was paternalistic and prejudicial.

An extension of time in which to have the instructions clarified and to amend the application was appropriate. The large number of amendments that were subsequently filed [69] and the results of the Court-ordered poll of those who abstained on the thirteenth region question [70] testify to the Natives' confusion.[71]

**66.** *Supra*, at 8.

**67.** *Id.*

**68.** *Id.*

**69.** 1,791 amendments were filed according to Defendants' August 16, 1974, response to the Order of December 19, 1973.

**70.** Questionnaires have been submitted to the Court as received.

**71.** The poll of those who abstained was for informational purposes only. The Court did not and does not intend to extend the time for amending enrollment applications beyond the date promulgated in the Federal Register, August 15, 1973.

Such an extension of time was promised by the Secretary—first orally, then in letters to the Native organizations, and then in the Federal Register. The only condition was that the application itself be timely filed on or by March 30, 1973.

It all appeared to be straightforward, but it was not. "The regulation, now 25 C.F.R. 43h.14, was deliberately drafted in negative terms so as not to give the impression that amendments were ever permitted as of right, but merely to assert that any requests received after August 15, 1973, would not be considered at all . . ."[72]

The Deputy Assistant Secretary of the Interior wrote one organization that

if some of the Alaska Natives who have filed enrollment applications within the required time have made errors in law or in fact in completing the form, they may within a reasonable time file amended applications by letter stating the changes and the reasons therefor. Such amendments may not be so delayed as to hamper the enrollment process, and should in any case be filed by June 1, 1973.[73]

But in fact "the Enrollment Coordinator rejected all requests for amendment and amended enrollment applications between May 9 and August 15, 1973."[74]

While the Enrollment Coordinator was changing previously granted amendments of column 22 back to their original vote, the Secretary of the Interior was assuring Senator Jackson and Representative Meeds that all amendments received prior to May 9 were processed.[75]

**72.** Second letter from Charles M. Soller to Floyd L. France, *supra*, note 45, at 9.

**73.** See Testimony of Robert Bruce, *Hearings, supra*, note 27, at 62.

**74.** Second letter from Charles M. Soller to Floyd L. France, *supra*, note 45, at 9.

**75.** *Supra*, note 33. The Court presumes that Secretary Morton was unaware of the change in policy which had been adopted by the Enrollment Coordinator.

All this was being inflicted upon poorly-educated Alaska Natives, for whom the United States, acting through the Secretary of the Interior, "has charged itself with moral obligations of the highest responsibility and trust." *Seminole Nation v. United States*, 316 U.S. 286, 297, 62 S.Ct. 1049, 1054, 86 L.Ed. 1480 (1942).

A Court of justice should not stand idly by in the face of such bureaucratic inconsistency, lassitude, and insensitivity to its trust.[76]

Basic fairness and equity compel the counting of all amendments received on or by August 15, 1973, and the creation of a thirteenth region.[77]

Plaintiffs ANAO have urged a new election as the preferable equitable remedy for the arbitrary and capricious conduct of the defendants. A year ago a new election might have been the better remedy. But not today. For one thing, payments from the Fund have been disbursed and non-resident Natives have received their portion through the twelve Regional Corporations. As a result, these Corporations possess an incumbent's advantage. The original situation, before any distributions from the Fund had been made, cannot be duplicated.[78]

Secondly, a new election would take a long time. But as time passes, the problem of funding a thirteenth region from future distributions from the Fund to the twelve Regional Corporations becomes more and more difficult.[79]

The Court is not unaware of the plight of some non-resident Natives who might have missed the August 15, 1973, deadline for amending their applications to enroll in—or out of—a thirteenth region. But this plight can better be solved by the promulgation of new regulations permitting amendments.

The Court's decision does not preclude such regulations. It only declares that no matter how many non-resident Natives now elect—if they are given the opportunity to do so—to enroll in or out of a thirteenth region, a thirteenth region has been established in accordance with the Alaska Native Claims Settlement Act and the Administrative Procedure Act, and that a thirteenth region shall continue to exist for non-resident Natives who have elected, or will elect, if so permitted, to be in it.

Counsel for AFNI plaintiffs will present an appropriate Order for the Court to consider.

---

76. *United States v. Ahtanum Irrigation District*, 236 F.2d 321, 338 (9th Cir. 1956), cert. denied, 352 U.S. 988, 77 S.Ct. 386, 1 L.Ed.2d 367 (1957).

77. 5 U.S.C. § 706(2)(a).

78. On January 14, 1974, this Court granted the motion of the Aleut Corporation to intervene as a party-defendant. But it also required Aleut to send a retraction to each abstainer to whom it had sent on December 21, 1973, a letter urging a "no" vote on the thirteenth region. This illustrates the propaganda war that has been going on throughout the year between proponents and opponents of a thirteenth region. Such propaganda makes it even more difficult to duplicate the conditions of the original election.

79. Deposition of Charles M. Soller at 112, filed October 10, 1974.